## Vincent's Appeal.

1. Difference of rank attending a dubious relation will have effect, but cannot overturn unequivocal and frequent admissions of marriage, cohabitation and reputation, the husband's support of the wife and children, recognition of them as the offspring of the reputed relation, and expressions of attachment for his wife and them.

2. An endorsement by the husband on a false certificate that it was the certificate of his marriage is an admission of marriage.

3. The policy of this state, where marriage is a civil contract, often unattended by ceremony and performed by a single witness, demands that the marriage relation should not be lightly discredited and issue bastardized, although surrounded by mystery in its origin, and it be suspicious in its circumstances.

4. An unavowed marriage established after the husband's death.

January 13th and February 1st 1869. Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ. WILLIAMS, J., at Nisi Prius.

Appeal from the decree of the Orphans' Court of *Philadelphia*: No. 227, to January Term 1868.

The appeal was by Catharine E. Vincent, in her own right and as guardian of William Henry Vincent, a minor, from the decree of the Orphans' Court distributing the estate of Vincent De Amarelli. The parties were the executors and the legatees except Mrs. Vincent on the one side, and Mrs. Vincent on the other.

The decedent died on the 26th of February 1864, leaving a will dated July 15th 1852, with five codicils, dated respectively July 6th 1855, November 18th 1856, June 26th 1860, June 24th 1861, and July 6th 1863. He described himself "of Rossano, in the kingdom of the Two Sicilies." He appointed Vito Viti, William Duane, Sebastiano Dacorsi, of New York, and William F. Littleton his executors. His property in this country was altogether personalty, and amounted, as appeared by the report of

the auditor, to about $18,000. It was bequeathed principally to relatives in Italy. By his 3d codicil he bequeathed $500 to Catharine Evans Vincent, daughter of Mary and Patrick Evans, born in Ireland, for having assisted and nursed him "with all care, solicitude and earnestness of a mother, every time I have been sick in my long residence in Philadelphia. I will that these five hundred dollars may be invested in her name, and as her property, in one of the best saving banks, or in any best establishment, which may be more safe or produce more interest to her."

By his 5th codicil he provided as follows:—"I bequest to Catharine Evans *Vincent, living* 434 *Harmony street, above Catharine street*, who nursed me in my sickness as a mother, two thousand and five hundred dollars, besides the five hundred dollars which I bequested to her with my precedent codicil, so that she may have three thousand dollars altogether, and all my dresses, linen, books and everything which I consigned to her for safe keeping during my absence from Philadelphia; and if I shall die in Philadelphia, I dispose that all my things which I wear may be given to her, whatever may be the house in which they will be found." In his will and one of his codicils he declared he had lived and would die "professing constantly the Catholic Apostolic Roman religion."

Mrs. Vincent had two children living, one, Joseph, born in November 1861, and the other William H., the minor above mentioned, born October 7th 1864, and after the death of the decedent. Before the auditor, A. I. Fish, Esq., Mrs. Vincent claimed distribution for herself as the widow of the decedent, and for William H. as his legitimate posthumous child. The fact of her marriage was the only contested question before the auditor. He found that there had been no marriage, and distributed the estate under the will and codicils. The Orphans' Court, upon exception by Mrs. Vincent, confirmed the report, and she appealed to the Supreme Court.

The Supreme Court reversed the decree of the court below and the finding of the auditor on the *facts*. It is necessary, therefore, to an understanding of the case, that the evidence should be reported more at length than otherwise would be required.

For Mrs. Vincent, Sarah Redman testified:—That living in German street, Philadelphia, about 1858, and having advertised to take boarders, the decedent asked her for boarding for himself and wife; he said he would bring his wife to see the rooms; he brought Mrs. Vincent, and introduced her as his wife; she boarded there over three years; he said his business would not allow him at all times to take his meals there; said he had been married but a short time; Mrs. Vincent had two children whilst living there which he acknowledged to be his; one has since died. He was fond of Mrs. Vincent; her bearing and demeanor were exemplary

[Vincent's Appeal.]

and proper. Witness having expressed doubts as to the relations of the decedent with her, he produced a paper which he said was a certificate of marriage. The paper was not in English; it satisfied the witness. Decedent always acknowledged Mrs. Vincent to be his wife; some of her relations came to see her at the house of witness. Witness once asked him why he did not take Mrs. Vincent home to live with him; he said she was not distinguished enough; said he admired her, and for that reason married her. He was not liberal; made out that he was poor. In her confinements he allowed the nurse to stay as long as Mrs. Vincent wished. He did not spend every night with Mrs. Vincent; he was not more than two nights in the week. He was absent several months in the summer. Mrs. Vincent is a Roman Catholic. She was very saving. The decedent always brought the receipts to witness ready written, and she signed them. The husband and a son of Mrs. Redman testified substantially in the same way. The husband also said that the decedent and Mrs. Vincent came to board at his house in 1858; when he came to the house he often inquired for "his wife." He was a polished gentleman; she was a plain, respectable Irish girl; might take her for a dressmaker. Once a friend of decedent's came there with him.

Mrs. Taylor testified:—She lived No. 434 Harmony street, near Mrs. Redman's, and had seen the decedent go to Mrs. Redman's; Mrs. Vincent afterwards rented a room of witness, and had lived there ever since. Decedent would knock at the door and ask for his wife, and would go up to her room; if she was out he would wait there till she came in. He was at witness's house at one time about two months, when he was sick. He was very affectionate in his treatment of Mrs. Vincent; they lived happily together; Mrs. Vincent's conduct was amiable and upright, and attached to her home. Several persons (named by witness), including relatives, called to see Mrs. Vincent.

Mrs. Butler testified:—Mrs. Vincent and decedent had boarded with her mother before they went to Mrs. Redman. They lived there as man and wife. She introduced decedent to other persons as her husband. He generally took his meals there, and they walked out together. She testified also to other facts of the same general character as the preceding witnesses. Mrs. Dugan, in addition to similar facts, testified that decedent repaid money borrowed of witness by Mrs. Vincent, saying his wife had borrowed some money and he had come to pay it; also, that they were regarded in the neighborhood as man and wife.

Mrs. Christy the nurse testified, that during Mrs. Vincent's confinements the decedent was at her boarding-house almost every day, was attentive to her, spoke to her as Catharine; spoke of her as his wife or Mrs. Vincent. They were affectionate, and apparently attached to each other. They were always regarded

[Vincent's Appeal.]

as husband and wife—with other testimony corresponding with that of former witnesses.

Mrs. Gilmore, the mother of Mrs. Butler, testified :—The decedent applied to her about November 1857, for boarding for his wife, and brought Mrs. Vincent to see the room; said, he wanted steady board for his wife, his business took him from the city. He always called her his wife, she acted as a wife should; her demeanor was that of a respectable woman.   Gentlemen called there to see him; they were Frenchmen.   Decedent and Mrs. Vincent went out together as men and their wives generally do.

Ann Gillespie testified that she was raised by Mrs. Vincent's aunt, and visited Mrs. Vincent in German and Harmony streets. She was introduced by Mrs. Vincent to decedent as her husband. Mrs. Vincent about 1856 lived with Mrs. Williams, in Walnut street, as a servant.   The decedent boarded at the same house then.

Lydia Nagle testified, Mrs. Vincent had lived with her as a servant about or after 1854; witness visited her "after she was first married."   The decedent came into the house and was going up stairs, Mrs. Vincent called him into the parlor and introduced witness, saying, "Mrs. Nagle, my husband, Mr. Vincent." Whilst there Mrs. Vincent took up her child and the bell rang, she said to decedent, "take Josey while I answer the bell."   He took the child and fondled on him.

Mrs. Murphy testified:—She was a cousin of Mrs. Vincent. Mrs. Vincent had been in this country since 1851, when she was seventeen or eighteen years old.   Witness had seen the decedent and Mrs. Vincent five or six times at Mrs. Redman's and Mrs. Taylor's in the presence of their families.   Mrs. Vincent introduced him to witness as her husband, he said he was happy to make witness's acquaintance.   Once, when he came, she asked him if he had had dinner, and prepared it for him; another time he came with his valise, said he was tired, asked Mrs. Vincent if there was water up-stairs to wash, and went up.   Mrs. Vincent had a brother who is dead, two uncles and three aunts, some of the children of these are living; she stayed some time with her aunts, and went to live with a family in the country, then went to Mrs. Nagle's and Mrs. Williams's.   Witness heard, in February 1858, that Mrs. Vincent was married.

Alfred Evans testified :—He lived in Harmony street, and knew decedent by sight and reputation, seeing him go to the house of Mrs. Vincent.   The reputation in the neighborhood was that the decedent was her husband; witness never heard it questioned.

Urias Wassaman, a dry-goods merchant, testified that the decedent dealt with him six or seven years; witness took goods pur-

[Vincent's Appeal.]

chased by the decedent to the house where he and Mrs. Vincent lived and measured them before them; he returned some shirt-bosoms once because his wife said they were not fine enough. Mrs. Vincent never came to the store.   He told witness of the death of his little boy whilst he was absent, and said he was sorry, as he could not be at home.

Henry Jones, who worked as tailor for decedent, heard him speak of Mrs. Vincent as his wife, gave his name as " Vincent," and called her " Mrs. Vincent."

Anna Gillespie testified that she had been raised by Mrs. Murphy, an aunt of Mrs. Vincent; Mrs. Vincent lived with the aunt in November 1858, and so far as witness knew was not married before that time; she left Mrs. Murphy's shortly after November 1858, and went to Mrs. Nagle's and was there learning vest-making.   She and her aunt had some words then about her keeping company; the aunt did not wish her to leave her house, and Mrs. Vincent wished to stay, but she wanted to keep company. She came back and stayed a little while, then she left the house, and the next thing they heard was that she was married.

Mrs. Vincent gave in evidence a number of letters from the decedent, post-marked Newport, Boston, &c.; they were addressed on the envelopes, " Mrs. Catharine Vincent, care of Mrs. Red-man," &c.   In one dated Newport, July 21st 1859, he writes:—

" My dearest Catharine—

" Far from you, I feel lonesome and it longs me to see you again on the evening of 31st August next, in which I will be in Philadelphia in your for me very agreeable company.   I love you more and more, and I hope that you will reciprocate my affection and estime to you : I have been happy with you, and I will try to make you always happy content and satisfied with me.   I will not write any other letter to you till my return to Philadelphia, but you will be so kind as to answer me and tell me how you are." * * * "I will remain here till August 29, I will come back to New York on the 30th and I will be in Philadelphia on the evening of Wednesday, August 31st next, and I will be very happy to see you.   If you go in the country or if you remain in the City do not expose yourself to the Sun, do not spoil your pretty complexion of face and of the hands in exposing yourself to the hot beams of Sun ! take good care of your helth precious for me." * * * " Be sure of my constant love and affectionate estime of you my dearest Catharine !   We will be always happy and satisfied each other of our mutual love and regard.

" My compliments to Mr. and Mrs. Redman.
                              " I am truly your
                                    very affectionate        VINCENT."

[Vincent's Appeal.]

In another dated Newport, August 10th 1859 :—

"My dearest Catharine—I wrote you since the 21st July and have been very uneasey not having received any answer; then I pray you to answer this immediately, for my quiete and consolation.

"I hope that you are very well. * * Tell me, if you had nice time in the country, and if you enjoied good helth during my abscence: if the Dr. Gardiner has been satisfied with your payement: if Mrs. Redman continues to treat you as well as usual: What you are doing now, and in what you spend your time, which I hope may be pleasant in continual company of your relations, and being I absent, I flatter myself that you sometime think of me. I went to Cape May, where I remained 4 days: then I went to New York by sea, and after to Saratoga, where I remained 10 days: then I came here, where I arrived on the 20th of July, but I have been disappointed by the family, which promised so much to me, because the young Ladies were not here: then I am here only for my account. I love you more and more, I think always great deal of you, and I feel lonesome far from you. It longs me to see you again, and I will try to be in Philadelphia on Saturday evening 27th August, or certainly on Thursday evening 1st September.

"My thoughts and my feelings are always on you, who are the best object of my love and constant affection and estime. I will be very unhappy (as I have been till this moment only because deprived of your news, which I expected every day so anxiously) if you do not write me immediately, and releive me of all paine and sorrow, of not hiering of your helth very precious to me.

"This is the address

"Mr. D. A. Vincent,
"Newport,
"Rhode Island.

"My compliments to Mr. and Mrs. Redman—and you receive my tender embraces—

"I am truly yours, most affectionate
"VINCENT."

"Saratoga Spring N. Y. Monday 30th July 1860

"My dearest Catharine—I am perfectely well, and I hope that you and George may be in good health—I have been for the 8 days to the Cape May, after I visited in New York the Great Eastern, and then I went to Albany and here I will start from here on Thursday the 2d of August for the Lake George and for Boston, where I will be in the beginning of the next week—

"Wright to me so

"D. A. VINCENT Boston—Mass.

[Vincent's Appeal.]

immediately so I will receive your letter on my arrival there—I think always of you, I dream every night of you, I shall be happy to see you on the 1st or on the 5th September:

"So I will not wright you more letters. I hope to find you and George in very good health—Love me, as I love you, and trie to make happy each other with our mutual fidelity estime affection regard and love. Remember me to Mr. and Mrs. Redman

"I am constantily you very affectionate

"VINCENT."

"Boston Mass—August Tuesday, 7. 1860

"My Dearest Catharine—I have received yours 2 letters in this moment, and I cannot express you my deepest sorrow, and grief, for the death of my very dear George, whom I loved very much, being he so pretty child. We must in this visitation to uniform ourselfs to the will of the Providence: he is now in *Paradise* and pray God among the angels for you and for me. I am now very unhappy for this sudden loss. He would have been my consolation, and my delight.

"Now take care of your health, which is very precious for me, because I love you more and more, and I will try to make you always, so happy, as I can— * *

"It is impossible to me in the position of my health to come now in Philadelphia; then I enclose you in this letter a bill of 5 Dollars which is the only money that I can spare. You will call on the Undertaker of one of the nearest Catholic Roman Church, and you will send the child in the most simple coffin to the Roman Catholic Cemetery of St. Mary, or of the Cathedral, or of St Filip, without any carriage or funeral, to avoid the expenses, which I am unable to pay, and which are useless, and are made only for the pride and ostentation. So I think you can have him buried for 3 Dollars: you will not accompany him to the grave, to avoid to be taken sick by the emotions and the sorrows.

"The Doctor and Medicines will be payed by me, when I come back, and all other expenses for your health, and comfort—I do not know, when I shall be able to return, because the voyage is very long, And I could not adventure myself to travel being sick as I am now.

*      *      *      *      *      *      *      *

"If you feel too distressed go to see your cousin Murphy, so you and she will comfort and alleviate yours sorrows, having had both the same visitation and the same loss.

"Wright me how you feel, and how is your health, and if you have received the enclosed bill of 5 Dollars—.

"D. A. VINCENT, Boston, Mass.

[Vincent's Appeal.]

"Take care of your health, and believe and trust in my constant affection and love for you—

"My respects to Mr. and Mrs. Redman

Your very affectionate                    VINCENT."

"Boston, Mass—Monday august 13th 1860

"My dearest Catharine—I have received your letter of the 8 August, and you are perfectly right in your sorrow, for the loss of so pretty and interesting a child, for which I am myself inconsolable. If I were not sick, and unable to travel I vould have fled to assist you in your truble, although I could not reach Philadelphia before He might be buried.

"The Religion only can give both the right to submit to this visitation. God called George to the Paradise; he was to good for this vally of tears and miseries: he is now enjoing among the angels of Heaven and praying for you and for me. Now you most take care of your health, and mine: you can lose both, if you do not try to compose yourself seeking some distraction, going out frequently with Mrs. Redman or with Mrs. Murphy, to Fermont or some other places of amusement and distraction in the river, in which the music can give to you some relaxation of your maternal distresse and grief, which are useless, because you cannot recall him in this earth of unhappiness—

"I have George always in my mind, in my ies and in my heart: I think always of him, I loved him very much, then I pity you and myself, deprived of his innocent and attracting smiles: but I try to compose myself thinking that he is no more subject to the paines and sorrows of this world, and that he is now very happy among the angels of the house of God. We must respect the will of the Providence, which in calling him made him happy, foreseeing that he perhaps could not be happy at all in this world. * * * Wright to me on next Monday 20th August a long letter giving me all your news about your health—I will not answer because I will be in Philada. as soon as I can, as least on the 4th or the 5th September—

"Direct———D. A. Vincent.

"Boston, Mass—

"Nahant

"Love me, as I love you—When I will be in Philadelphia I will try to comfort, compose alleviate consol and make you as happy as I can—

"My thanks to Mr. & Mrs. Redman, who will be satisfied of all expenses.                    I am your affectionate

"VINCENT."

A paper purporting to be a certificate of marriage, and being that shown by the decedent to Mrs. Redman, and its envelope, were given in evidence by Mrs. Vincent. The certificate and

endorsement on the envelope were proved by Mr. Duane, one of the executors, to be in the handwriting of the decedent, slightly disguised. The signatures of the priest and witnesses are in a heavier hand. The certificate is in Latin, and (translated) is as follows:—

"I testify that by authority conferred on me I have, in the name of the Father, Son and Holy Spirit, joined in secret marriage, but according to the form of our Holy Mother the Catholic Apostolic Roman Church, Miss Catharine Evans, lawful daughter of Mary and Patrick Evans, born in Ireland A. D. 1835, with Mr. Dominick Antony Vincent, lawful son of Mary Antonia and Joseph Vincent, born at Paris A. D. 1814. For faith of which this document is subscribed in our handwriting and in attestation fortified with our seal. Given in the city of Philadelphia, in Pennsylvania, on the first day of December, in the Year of human Salvation 1859.          J. BORREX, D. D.   [SEAL.]

"Witnesses.
"E. F. DUNGLINSON.   [SEAL.]
"K. S. DESTUET.      [SEAL.]
"G. R. LAFITTE.      [SEAL.]"

The endorsement on the envelope is in English, and is as follows:—"Certificate of the marriage of Miss Catharine Evans from Ireland with Mr. Dominick Antony Vincent from Paris."

A number of receipts from Mrs. Redman were given in evidence, in all which it was stated they were for boarding "Mrs. Vincent" or "Mrs. C. E. Vincent." Occasionally there were other items which also related to Mrs. Vincent.

The accountants and legatees called a number of witnesses.

William Duane had become acquainted with the decedent about 1850. He then showed witness a large number of certificates of membership of learned societies in Europe, and at his own request, on the proposition of witness, he was elected a member of the Pennsylvania Historical Society. He received a pension from the Neapolitan Government. The witness visited him at his different boarding-houses till his death, and never heard of his having been married till after his death. He always passed as a single man; and it was reported that he was engaged to be married to a lady who kept a school, where he was teaching Italian. He was professor of Italian in the University of Pennsylvania; also in the Polytechnic College in Philadelphia. He was an Italian by birth, and a man of great refinement and amenity. He was highly spoken of by all who knew him; he taught in the most respectable families, and in some of the best boarding-schools for young ladies. Vito Viti, an Italian, aged about seventy-nine years, who had resided in Philadelphia fifty years, knew the decedent intimately since he came to Philadelphia; decedent was reputed to be a single

man; said he never would be married. Witness having occasionally seen decedent going down Fourth street, and asking him about it jokingly, decedent tried to check him, and evidently did not want to tell him anything about it. After the death of decedent, witness called as one of his executors in Harmony street, and asked for Miss Evans: Mrs. Vincent came in and he addressed her as Miss Evans. He then told her, Our friend, De Amarelli, is very sick; the physician said he could not live till dark. She asked if she could go and see him: witness said it would be imprudent for her to go and see him at his boarding-house. Not seeing her affected, he told her he was dead; and, that he had left her $3000. She said, I know. He then told her who were the other executors. She said, I know. Afterwards she sent for witness, and told him that she was pregnant, and said, I am married to Mr. Vincent. "I said, Are you not mistaken? I have been De Amarelli's friend ever since he has been in Philadelphia, and he never mentioned to me that he had a wife—you must have a certificate? And she said, Yes; if you want, I will go up stairs and get it. And I told her, No; your word is enough. I said, At what place were you married? She said, By an alderman. I said, Was there a witness with you? She said, Yes, sir. I said, Now for the money—you go and see Mr. Duane, and we will do as he thinks proper. I told her, As you say you are married, it is better that you go and get a lawyer. I then left the house." Witness went to see her again, and asked her to let him see the certificate. She brought down the paper given in evidence and showed it to him. "I had this paper in my hands, and I remarked, what was this signature, looking at it, if 'Borrek' or 'Borrex?' And she replied, Yes, this is the priest. Then I asked her, pointing to the witnesses' names, What are these three, and she told me, They are the witnesses. I said, You saw these gentlemen sign their names? She said, Yes. I said, What kind of priest was it—tall or small, or middling size? When you were married, how was he dressed; had he the stole? What church did you go to—St. Mary's or St. Joseph's? She told me, No; we went down town to a small street, and it was a very dark night. I said, You would know about the street or the house? She said, It is impossible; because it was so dark and so rainy an evening it is impossible that I could find again that house. I said, What conversation had you there? She said, They all talked French; I could not understand a word. I said, When you left the house, did you all go together? and she told me, Yes; we went all together, and those gentlemen took one way, and myself, with him, went home: that is all I can say as to this affair of the marriage." She said she went travelling with decedent; and to the opera very often. "I said, I never saw you with him. Oh! she said, He left me in the lodge, and went him-

self into the subscribers' seats." On cross-examination, witness was asked, whether when he first called to see Mrs. Vincent, he was not told that there was a married lady there named Mrs. Vincent whose maiden name had been Catharine Evans, and he got angry and excited, and said, "No marry at all; no marry, I mean Catharine Evans;" and, that he was then told she was married and had a beautiful boy up stairs; and that when the child was brought in witness did not say, "that be him, that be him;" and also say, on being shown a photograph of the decedent, "that be him."

Witness answered these questions in the negative.

Mr. F. Littleton at an interview with Mrs. Vincent, in company with Mr. Viti, asked her whether she knew at the time she was married that the decedent's name was De Amarelli. She replied that she did. When inquiry was made as to the circumstances of her marriage, "she mentioned a street—and I think named Quince; that she was married in a house in that street, by a priest, and that there were persons present that were strangers to her, who she supposed were Frenchman, as she thought they spoke the French language. She said it was at night; and I think she said it was raining."     *      *      *   .   *      *      *

"She did say that the people were strangers to her, and I think it a fair inference from her conversation that it was a strange house to her; though I cannot recollect that she made use of such an expression as relating to the house."   *    *   "Mrs. Vincent told me that she got acquainted with Mr. Vincent at a boarding-house in Locust street, near the Spanish consul's, which is below Tenth street, and I think she said either that she lived there as a servant, or that a friend of hers lived there as a servant, through whom she became acquainted with Mr. De Amarelli. Quince street runs south from 1112 Walnut to Lombard street."

John C. Destouet knew decedent slightly. Was not present at the marriage, and knew of no one by the name of K. S. Destuet; the only persons of the name of Destouet whom he knew in this country were himself and brother; the signature as witness was not his, and he was not present at the marriage; he said the decedent was reputed to be a single man.

John L. Lafitte knew the decedent; said he was reputed to be a single man; he was not present at the marriage referred to in the certificate; know of no one living in Philadelphia named G. R. Lafitte.

William Heaton testified, he knew the decedent about six months before, and up to his death; he boarded with witness; he was considered a single man; ordinarily took all his meals and slept at the house.

Mrs. McCumpsey testified, that decedent came to board with her in 1856, and continued there till 1863. Except on his absence on summer excursions, he never missed any meals; he was away

[Vincent's Appeal.]

on two occasions from Saturday to Monday with a pupil in the country. He was never away from his room at night; his reputation was that he was a single man. She knew a person named Catharine Evans, who called twice whilst decedent boarded with witness. Witness asked him if that was one of his pupils. He said it was a person to mend his linen. He told witness he had by will left all he had to two brothers in Italy, except a legacy to a female where he boarded, for her kindness in taking care of him when he was sick.

Mrs. Vincent in rebuttal recalled Mrs. Taylor. She testified that when Mr. Viti called to see Mrs. Vincent, and asked for Catharine Evans, witness said there was a married lady lived there whose name was Mrs. Vincent, and that her maiden name was Catharine; he said "no marry, no marry Catharine Evans," he appeared to be angry. When the child was brought in he said "that be him," and said the same when decedent's photograph was shown to him.

The errors assigned were the confirmation of the auditor's report.

*E. H. Hanson* and *Daniel Dougherty*, for appellants.—In Pennsylvania the fact of marriage may be proved by the admission to the parties to it: Guardians of the Poor *v.* Nathans, 5 Penna. Law J. 1; Hill *v.* Hill, 8 Casey 511; Kenyon *v.* Ashbridge, 11 Id. 157; Physick's Estate, 4 Am. Law Reg. (N. S.) 418. The certificate was a declaration in writing of decedent acknowledging the marriage: Nokes *v.* Milward, 2 Addams 386; Montague *v.* Montague, Id. 375. His declarations that he was not married are of no weight: In re Taylor, 9 Paige 511. Marriage may be presumed from cohabitation and repute: Commonwealth *v.* Stump, 3 P. F. Smith 132; Hamilton *v.* Hamilton, 9 Cl. & Finn. Appeal Cases 327; Goodman *v.* Goodman, 4 Jurist, part 1, N. S. 1220.

*G. Junkin*, for appellees.—The decision of an auditor upon questions of fact ought not to be reversed unless it clearly appears that he has decided against the evidence: Harland's Estate, 5 Rawle 323; Gossner's Estate, 6 Whart. 403; Ludlam's Estate, 1 Harris 190; Whiteside's Appeal, 11 Id. 116; Riddle's Estate, 7 Id. 431; Loomis's Appeal, 10 Id. 319; Bull's Appeal, 12 Id. 288; Miller's Appeal, 6 Casey 478; Mengas's Appeal, 7 Harris 221; Mellon's Appeal, 8 Casey 121; White's Appeal, 12 Id. 134; Chew's Appeal, 9 Wright 228; Mahler's Appeal, 2 Id. 221; Burrough's Appeal, 2 Casey 266. The appellant was not deceived by the certificate; she knew his name was not Vincent; he would not therefore be estopped as to her: Dalzell *v.* Odell, 4 Hill 215; Pickard *v.* Sears, 6 Ad. & El. 475; Rensslaer *v.* Kearney, 11 How. 297. Reputation is the evidence of facts from

which a marriage might be inferred : 1 Greenlf. Ev., § 107 ; Cunningham *v.* Cunningham, 1 Dow. P. C. 514, 2 Greenl. Ev., § 462. Marriage in Pennsylvania is a civil contract, and must be proved like any other. It may be by the witnesses to it, or by declaration, admissions and the cohabitation and surroundings of the parties : Chambers *v.* Dickson, 2 S. & R. 475 ; Thorndell *v.* Morrison, 1 Casey 326 ; Hill *v.* Hill, *supra ;* Kenyon *v.* Ashbridge, 11 Casey 157 ; Hantz *v.* Sealy, 6 Binn. 405 ; Senser *v.* Bower, 1 P. R. 452 ; Physic's Est., 4 Am. L. Reg. (N. S.) 418. What did the parties mean at the time ? See Hertzog *v.* Hertzog, 5 Casey 469 ; Swires *v.* Parsons, 5 W. & S. 358 ; Candor's Appeal, Id. 515.

The opinion of the court was delivered, February 23d 1869, by
AGNEW, J.—Catharine Evans, an humble Irish Catholic girl, then about sixteen years of age, leaving her parents, came to the United States in 1851, and lived for a time with an aunt in this city, sometimes going out to service, and sometimes learning to sew, and married the testator, as all her relatives believed, in 1858. There is not a spark of evidence against her purity, and not a breath of suspicion had sullied her reputation previous to her reputed marriage.

Vincencio De Amarelli, sometimes called an Italian and sometimes a Frenchman, came to the United States from Rossano, in the kingdom of the Two Sicilies, in the year 1850. A well-born gentleman, of education and culture, a professor of the Italian language and literature in the University of Pennsylvania, of forty-four years of age ; associating with gentlemen and mingling in the best society, he was proud of his position and jealous of his reputation. Nature, however, asserted over him the sway of his passions, and he formed an intimacy, as the sequel has proved, with the humble Irish girl, and soon afterwards recognised her as his wife. Their intercourse was meretricious, says the auditor. But on what proof ? It is drawn chiefly from the difference in their stations in life, from the fact of a false marriage certificate, from *his* double manner of life, *her* conduct when called upon by Vito Viti, the executor, and the absence of proof as to the origin of their intimacy.

Difference of rank attending a dubious relation will have effect, but cannot be permitted to overturn his unequivocal and frequent admissions of marriage, their cohabitation and reputation among those to whom they were jointly known, his support of her and his children, his constant recognition of them as the offspring of their reputed relation, and his many and strong expressions of attachment for her and for them.

What proof is the false marriage certificate that there was no previous actual marriage ? It is written in Latin obviously to prevent its being read by Mrs. Redman or Catharine, and bears

[Vincent's Appeal.]

date a year and a half after the relation notoriously had commenced. When translated it purports to be only a certificate of the fact of marriage, not of the time when it was celebrated. But that which is important and puts it on the footing of the paper in Hamilton v. Hamilton, 9 Clarke and Finnelly's Appeal Cases 327, is, that De Amarelli endorsed upon it in his own handwriting that it was the certificate of their marriage. This is an admission of the marriage, even though written on the back of a false paper. It is true, had there been no pre-existing evidence tending to show marriage, its effect might be light, but following as it does, and being followed by his acts and admissions, it cannot be rejected. The purpose of the production of the paper must also be noticed. He had asserted their marriage to Mrs. Redman, and promised to bring witnesses or the proof of it. Unless, therefore, Mrs. Vincent knew it was a forgery, intended to conceal their illicit relation, the certificate has no effect upon the fact of marriage, neither proving nor disproving it. But the endorsement is different. It asserted a marriage to those who could read the endorsement, and being produced by Mrs. Vincent, her reliance on it at the time is evident. Its effect is as great if not greater, it seems to me, than the recognition of marriage signed by Dr. Hamilton. There the paper, though mentioned to have been shown to May Clarke, never came to her hands till his death. The intercourse between them had been illicit, followed by the birth of two illegitimate children, before the paper was signed; and when handed to Mr. Dickie, Hamilton said it was to please May. Yet it was held to be sufficient evidence of a private marriage: Appeals House of Lords, 1842, 9 Cl. and Fin. 327. See also Montague v. Montague, 2 Adams Rep. 375–9.

The double life of De Amarelli, as the auditor terms it, is used by him as a strong argument against the marriage. De Amarelli retained his former boarding-house, and his former associations, position and employment. He spent his Sundays and two or three days in each week and part of the night with Mrs. Vincent, making his excuse to those with whom his wife boarded that his business required his absence. Were there positive evidence of a meretricious relation, and the circumstances proving marriage slight, the argument to be derived from this mode of life would have weight. But, except the suspicions arising from such circumstances as this, there was no evidence of irregular intercourse. On the other hand, the reasons to influence him to such a course of life were strong. A polished, cultivated gentleman, of prepossessing appearance and engaging manners, moving in the best circles of the city, yet dependent on position for his pupils and means of living, his pride and fear of disclosure led him to change his name when he appeared to take boarding with his wife. T

10 P. F. Smith—16

same dread of the frowns of the world and of the taboo of society would lead to a private marriage. The same reasons would be used to satisfy the mind of a simple girl, who, content to be the wife of one so high, so elegant and apparently devoted to her, would be willing to trust him and serve him as she did, to the best of her powers, and thus live, as it were, half apart from him. His profession as a teacher of languages, and the class of pupils he must reach to make his living, were of themselves sufficient to excuse him to her, while his exceeding penuriousness led him to appear to her poorer than he was, and will account for many acts otherwise attributable to a different motive.

The auditor lays great stress on the testimony of Mr. Vito Viti, who, as De Amarelli's executor, called upon Mrs. Vincent to communicate the fact of the legacy to her. He had not heard of the marriage, and before the opening of the will knew nothing of Catharine Evans or Mrs. Vincent, as she was known. The state of his mind on learning of her claim to be De Amarelli's wife can easily be conceived. He, a foreigner of some pretension, bred in the ideas of another country, charmed by the polished refinement of his friend and countryman, dazzled by his connection with the baronet Fortunato Amarelli, whom his friend had remembered in his will, and wholly unwilling to believe in the degradation of this marriage, was not likely to view things in a light favorable to the humble woman who claimed tó be his friend's wife. Though doubtless a highly respectable and credible gentleman, but very aged, he is not precisely the one from whom we might expect an accurate account and unprejudiced relation of the interview with Mrs. Vincent. This is strikingly evinced by his cross-examination. He replies to a question referring to Catharine as Mrs. Vincent,—"No sir, no sir; it is all a lie!" He says "No" to the question "Did you not get very angry or excited and say, 'No marry at all, no marry; I mean Catharine Evans," and "No," to the assertion of Mr. Taylor that Mrs. Vincent was married, and had a beautiful boy; denying also his own expression of the child's likeness to his friend. In all these things and in others he is most distinctly contradicted by Mrs. Taylor. But why should it be esteemed remarkable that Mrs. Vincent made no inquiries for her husband at his boarding-house, and that his death and burial should take place without her knowledge? Had she not been taught, for the reasons stated, not to be where her appearance would expose the low relation he had formed? And why should it be thought so strange she should be reserved in the presence of Mr. Vito Viti? Gentlemen of his circle had not been brought to her humble abode, but doubtless she had heard of him from her husband. It was not strange ⸱n he called at her home, she should be reserved and cautious, apparently cold; and certainly it was not strange when he

told her of his name, she should reply, "I know." Was it strange, when informed of the legacy, she said, "I know"? It cannot be supposed she had not heard of the provision from her husband. Then what is there in the statement of Vito Viti to make it overturn a relation recognised by the parties and believed by those among whom they jointly appeared? It is only used to help out the theory that a man cannot marry beneath his station, a theory disproved by those gentlemen who marry their house-keepers.

Stress is laid on the fact that Mrs. Vincent brought no testimony of the origin of their relation. But why should this be considered an objection when the circumstances themselves indicate its privacy as well as its origin? She was a servant in the house where he boarded for a time, young and not unforbidding. Lust may have fired his purpose at first, but met by resistance, and by the well-known influence of her religion, and the guards it throws around Catholic females of her rank, accustomed to monthly confession, his desires finally drove him into a proposal of marriage consummated privately, to avoid the consequences he feared to his position and his profession. When his approaches were first made they were not probably in the presence of witnesses, and when he concluded to marry it is not likely his design would be published. All these circumstances which seemed to have impressed the mind of the auditor as proof of irregular intercourse, and denote possibilities which might have risen to probabilities had they not been met by contervailing facts, but, thus met, ought not and cannot convert an acknowledged wife into a mistress, and innocent offspring into bastards. Whatever doubts may be suggested, nowhere does the proof disclose a meretricious relation, or repel the presumption of a private marriage.

Now let us turn for a moment to the facts on the other side. And first, there is not a breath of evidence to sully her reputation, while witnesses speak of her in terms of praise. Says one —Her bearing and demeanor were exemplary and proper. Says another—She acted as a modest and well-behaved woman, and attached to her home; a plain, respectable Irish girl. A third says—I knew nothing of her but was amiable, and perfect and upright. A fourth—She was a plain, domestic woman. All speak of her as industrious, frugal and attentive to all her duties. In the argument, allusion was made to the testimony that she left her aunt, Mrs. Murphy, because she did not want her "to keep company." But when she left thus she is found at no improper place, and in no evil company. She is to be found at service and with a respectable lady, learning to sew; and then, said the witness, shortly after that we heard of her marriage. It is cruel to draw from this expression the idea of depravity. They know but little of the "simple annals of the poor" who would infer from

the expression "to keep company" that which blights this poor Irish girl's reputation.

There are circumstances pointing to the fact of marriage. Anna Gillespie, Mrs. Murphy's foster daughter, whose testimony refers very clearly to the spring of 1858, as satisfactorily proved by the auditor, says: "She left our house, and the *next* thing we heard was that she was *married.*" She is directly corroborated by Julia Murphy, the wife of Catharine's cousin, who heard of her marriage in February 1858. The month is probably a mistake, as the date of marriage given in the affidavit for an issue is May 7th 1858. Then we have the clearly proved fact that De Amarelli took his wife to Mrs. Gilmore's to board in May 1858. Thus the circumstances point very strongly, there being no proof of previous bad character, or of meretricious intercourse, towards a marriage in fact coincident with the very beginning of their avowed relation and cohabitation as husband and wife. From May 1858 until his death in 1864, their continued cohabitation as husband and wife is clearly traced. It is unnecessary to, dilate on the evidences of their cohabitation and mutual acknowledgment of their relation. They treated each other as husband and wife in the presence of all who knew them together, and with kindness and affection. He seemed to take an interest in his children, and to love them as a father. All his letters to her when abroad breathe devotion and love, and the deepest interest in her welfare. Thus he writes: "I love you more and more, and I hope that you will reciprocate my affection. I have been happy with you, and I will try to make you always happy, content and satisfied with me." "Be sure of my constant love and affectionate esteem of you, my dearest Catharine. We will be always happy and satisfy each other of our mutual love and regard." Again—"I love you more and more." "My thoughts and feelings are always on you, who are the best object of my love and constant affection and esteem." As to the child who died in his absence he writes thus—"I cannot express to you my deepest sorrow and grief for the death of my very dear George, whom I loved so much, being he so pretty child. We must in this visitation *uniform* (conform) ourselfs to the will of Providence; he is now in Paradise, and pray God among the angels for you and me." And again: "The religion only can give both the right to submit to the visitation. God called George to the Paradise; he was too good for this valley of tears and miseries; he is now singing among the angels in Heaven, praying for you and me. Now take care of your health and mine." These are strange words for a libertine to address to his mistress. He may have been a hypocrite and a villain, but strange that he should have thus written to a wanton, a mere parasite, clinging to him only so long as he might supply her cravings and ready to desert

him when she could find a better.    Whatever he might have been, this language shows that he knew she would receive it as a virtuous woman would the consoling words of her husband.    That she believed him to be such, is corroborated also by her mode of life. All the testimony is that she lived in an unpretending way, with only the common necessaries of life, and none of its luxuries. She was modest, plain, frugal and industrious, doing tailoring and sewing, as well as mending and sewing for her husband.    All this seems to be utterly inconsistent with a meretricious relation. There is another circumstance bearing upon the relation between them that may be noticed.    In 1860 he gave Mrs. Vincent a legacy of $500, by the 3d· codicil to his will.    But by the 5th codicil in 1863, after the birth of his second child, and as years cemented their union, which in the beginning might have been the result of his unconquerable desires, he bequeathed her $3000, and sundry articles committed to her.    Surely this looks rather like the gift of growing affection for a wife, than the improbable lavish of one upon his mistress, after appetite sated and desire quenched. .

It is unnecessary to protract this opinion to notice some minor circumstances, which are really answered by what has been said. It would not have been necessary to say so much had not the report of the learned and scholarly auditor been confirmed by the court below, requiring therefore plain error to be exhibited before it will be reversed.    This case is, distinguishable from Bicking's Appeal, decided last winter, on the ground of the absence of the proof of meretricious intercourse, which in that case had clearly existed in the beginning.    If there shall be no presumption in favor of virtue, if a woman can for years repose upon the bosom, and bear children to one who acknowledges her as his wife, expresses towards her the affection of a husband, and when death takes from them their child, endeavors to comfort her with his sympathy, with the consolation of religion, and the hope of a happy reunion in heaven—if all these things can be, and without strong evidence, nay with but suspicion for proof, we must pronounce that woman a mistress and her children bastards, then there is a foundation upon which the learned auditor could build up his controlling conclusion that the relation of the parties began in a meretricious intercourse.

The case of Gaines v. New Orleans, 6 Wallace 642, resembles this in some of its leading features.    There a private marriage of Daniel Clark to the mother of Mrs. Gaines, in 1802 or 1803, was testified to by .her sister.    Irregular intercourse had taken place and an illegitimate child born before the marriage, and after it a separation of years, Mrs. Clark, after his desertion, contracting a second marriage, and retaining the custody of Myra, the daughter of her marriage with Clark.    During all this time

[Vincent's Appeal.]

Clark imposed himself upon the world in a character wholly different from the real one. The Supreme Court of the United States, after more than half a century, held there was a private marriage, and attributed its concealment to the same feelings precisely which we have supposed must have actuated De Amarelli in the double life he led. False pride and the fear of degradation and the loss of his position in society seemed to have controlled Mr. Clark until, when nearing death, his pride gave place to natural feeling and a strong desire to rescue his daughter from the stain of illegitimacy. Hamilton *v.* Hamilton, before cited, is also strongly in point in this respect.

Upon the whole evidence, we are clearly of opinion in this case that the proof of marriage is sufficient, and that the circumstances relied on as disproving this presumption are too weak and inconclusive, in view of the explanation furnished by the circumstances themselves. Marriage, followed by the birth of issue, lies at the very base of the social fabric and of all good morals, and looking at the consequences to society we feel unwilling to suffer an acknowledged marriage and parentage of children to be overthrown by weak and inconclusive reasons drawn from the difference of position in life, and from conduct readily explained by the circumstances of the parties. Mystery may surround its origin, suspicion may linger in its circumstances, and slight doubt disturb its clearness, but the policy of the state demands that this relation should not be lightly discredited and the issue bastardized. This is necessary in a country where marriage is a civil contract and often unattended by ceremony or performed by a single officiating witness.

The decree of the Orphans' Court is reversed upon the appeals of Catharine Vincent in her own right, and as guardian of William Henry Vincent, and this court now finds and decrees that Vincent De Amarelli and Catharine Vincent the appellant were married and living in lawful wedlock at the time of and before his death, and that William Henry Vincent is the legitimate issue and one of the lawful representatives of said decedent, and the record is ordered to be remitted to the Orphans' Court, with directions to proceed and to distribute the estate of the decedent to and among the persons entitled to the same according to law; and the costs are ordered to be paid out of the estate.

Mr. Justice READ dissented.