## In the Matter of the Estate of Joseph H. Comly, deceased. Appeal of Eleanor P. Comly, Marion C. Comly, Amy L. Comly and Joseph C. Comly.

*Marriage—Findings of orphans' court as to fact of marriage—Evidence.*

Where the orphans' court finds upon sufficient although conflicting evidence that a woman claiming to be the widow of a decedent was in fact married to him, the Supreme Court will not reverse the finding unless. manifest error is pointed out by the person appealing from the decision of the lower court.

Where a man says to a woman, "Would you be willing to marry me in this way, that you and I are to live together until death separate us? I take you to be my wife and you take me to be your husband;" and she says, "Yes, sir; until death separate us;" and this is followed by the woman occupying a house procured by the man, where he came infrequently but as often as his duties permitted, up to the time of his death, a child being born in the mean time which was registered in the health office as the child of the woman, under the name of the man as her husband and the man openly acknowledges the woman as his wife, there is. sufficient evidence to justify a finding, by the orphans' court, of a marriage.

*Marriage—Oral contract of marriage—Evidence.*

Where a woman claims to be the widow of a decedent, and testifies to an oral contract with the decedent by which she became his wife, evidence that prior to such contract she had illicit relations with other men is irrelevant as to the fact of the marriage.

*Marriage—Oral contract of marriage in futuro—Evidence.*

Where the words in futuro in a contract to marry are followed by cohabitation, the contract is executed and the marriage is valid.

Argued Jan. 5, 1898. Appeal, No. 86, Jan. Term, 1897,. by Eleanor P. Comly et al., from decree of O. C. Phila..

County, dismissing exceptions to adjudication. Before STER-RETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed. STERRETT, C. J., and MITCHELL, J., dissent.

Exceptions to adjudication.

The facts appear by the opinion of the court by ASHMAN, J., which was as follows :

The difficulty which lay in the claimant's path to recognition as wife of the decedent was the absence of any formal ceremony of marriage. Whether wisely or not, the law of the state has placed marriage on the footing of a contract, and has so favored it as an institution as to relax the rules of evidence which it applies to all other compacts. A partnership for business purposes could not be proved by the fact that two or more parties merely consort together in a store, and are reputed in the neighborhood to constitute a firm ; yet cohabitation by a man and woman, and the general reputation that they are husband and wife, are legal proofs of marriage. Reputation, as a synonym for consensus of public opinion, has a fixed meaning, but it is not a word denoting extent of territory. A man who is the center of a large acquaintanceship in the city may have his home in a village miles beyond the municipal limits. In a question affecting the fact of his marriage, the opinion of the few neighbors who make up his social circle will outweigh the negative testimony of a thousand citizens who know nothing and care nothing about the matter. The proof by way of reputation, which was submitted by the claimant, and which was criticised as meager, must be weighed in the scale of this definition. The decedent had practically no home life ; he was employed in the fire department, was subject to call at any moment of the day or night, and six nights in every week he slept in the firehouse. The ordinary methods by which men maintain neighborly and friendly intercourse with their fellows were absolutely shut out to him, and socially he was almost as much of a recluse as the inmate of a prison. It is a matter of surprise, under these circumstances, that his repute as the lawful husband of the claimant should have been so well defined and so clearly established among the residents of the district in which he had settled the

claimant. His repeated acknowledgments that the claimant was his wife to the physician, the shopkeeper and the few visitors, bound him quite as effectively as they would if they had been made at a ball or printed in the shape of a visiting card. Such admissions are direct evidence of marriage, standing on a higher plane than the presumption arising from cohabitation and reputation, and being in themselves sufficient to sustain an indictment for polygamy: 2 Green. on Ev. sec. 461, note 1. It is touching very nearly upon sarcasm to say that the admissions of a man that he is married are declarations against his own interest; but they are, for the reason that marriage imposes new burdens and responsibilities. The evidence adduced by the claimant on this point, the most important of all, was emphatic, and it was not neutralized by the averments of the decedent's relatives that they had never heard of the marriage. Most of the inhabitants of Philadelphia would have testified to the same effect, if they had been called to the stand. The decedent had seen fit to conceal it from his kindred, and he had been enabled by the very nature of his occupation to keep up the deception to the end. The strength of the defense to the claim rests on the proposition that the contract was simply executory. However this may be, it was not entered into without deliberation. The decedent had satisfied himself by personal inquiry that the divorce between the woman and her former husband had been perfected, and he had formally proposed to her and had been as formally accepted. At a later day he said to her: "Would you be willing to marry me in this way, that you and I are to live together until death separate us; I take you to be my wife, and you take me to be your husband?" She replied: "Yes, sir; until death separate us." Even in form this was an absolute contract; the words of obligation on both sides were in præsenti. The decedent then asked: "Are you willing for that?" And the claimant answered: "I guess I would be; but don't you think we had better be married by a minister?" The decedent met this objection by saying: "It is just as lawful in this state as if we were married by a minister; all the ministers in creation cannot make you happy or make you do what is right; but if we live together and do what is right, we are just as lawfully married as if a dozen ministers married us." He was, theologically and technically, right in his

position.  See Richard v. Brehm, 73 Pa. 140.  The woman was convinced by it, and she accepted his offer to take her as his wife by immediately making her abode with him.  Can it be possible that any words which she might have spoken could have made out a present contract on her part more absolutely than did this act of acceptance?  She had said she would be willing to take him as her husband if a minister should marry them ; he had assured her that a minister was not needed, and she thereupon unconditionally took him.  Was it necessary to say in words what this act said more loudly than words?  In a hundred cases which might be cited, it has been decided that silence means acquiescence.  In this case there was something more potent than silence—the deliberate action of the claimant.  The contestants admit that if she had said to the decedent, " I take you," she would have become his lawful wife.  They aver that she said instead, " I will be willing to take you," and thereupon she actually took him at his word and became a profligate.  This is a narrow distinction on which to hang the character of a woman and the legitimacy of her children.  Just the opposite rule prevails, however.  Where words in futuro in an agreement to marry are followed by cohabitation, the contract is executed and the marriage is valid : 2 Kent's Com. *87 ; Dumaresly v. Fishly, 3 A. K. Marsh. (Ky.) 368 ; Richard v. Brehm, supra.

Next in importance as an item of testimony comes the claimant's interview with a reporter.  In spite of the asseverations of decedent's relatives that his marriage was unknown to them, some tidings got abroad that a wife was living, and immediately after the death a reporter called upon the claimant.  He admitted frankly that his object was to obtain a sensational story for his paper.  With that in mind, he commenced the interview by asking the claimant whether she intended to claim the body and take it from the custody of the sister.  He testified that she answered no, that she had never been married to the decedent, and that she was in great distress in consequence.  Her own account was that she told the witness she had never been married to the decedent by a minister.  It is unfortunate that the reporter was not cross-examined as to his own conception of what constitutes a valid marriage.  He may have shared the notion which prevails in a large class in society, that a

union which is not solemnized by a religious rite is meretricious, and have taken it for granted, when the claimant told him she had not been married by a clergyman, that she meant to say she had not been married at all. It is also quite possible that at this trying moment the claimant was harassed with a doubt which had never visited her before. She was alone in the world; the dead body of her husband was in the keeping of those who were strangers to her, and it was suddenly suggested that, as his wife, she was entitled to demand its custody. How should she prove the marriage which gave her that right, and which, in her faith in her husband's assertions, she had always believed had existed. She had no witness but herself, and she might have doubted her competency, even if she had known the process by which she could bring forward her evidence. She may be pardoned for the doubt; even the learned counsel for the contestants had the same misgivings, and vehemently objected to her right to testify as to the contract of marriage with the decedent. In Nathan's Case, 2 Brews. 149, the wife's doubt as to the fact of her marriage went so far that, after its alleged date, she charged her husband with seduction and brought an action against him for breach of promise. Yet it was held that these acts did not invalidate a marriage which had been sufficiently proved.

Other and minor details in the conduct of the claimant were the subject of reproach by the contestants. One was that she did not visit her husband in his last sickness. He had, however, advised her not to come, and had sent her almost daily a letter, assuring her of his early recovery. She attended his funeral, but without her widow's weeds, and, to add to the enormity of her offense, even without flowers. Her reason was that if she had worn the one or carried the other, she would have met, perhaps, as the reporter himself hinted, an unpleasant reception.

This case is not exceptional in character. Other cases are on record where the origin of the marriage relation was in doubt and where the proofs of cohabitation and repute were scanty, but where, nevertheless, the marriage was sustained: De Amarelli's Estate, 2 Brews. 239. and Hamilton v. Hamilton, 9 Cl. & Fin. Reps. 327, are among them. In the former, the wife lived in a circle so far below that of her husband, and her inter-

course with him was so limited, that she did not know of his death and burial in the city of her own residence. In Strauss's Estate, 168 Pa. 561, another element of proof was found in the public record of the birth of a child with the names of its parents. The registration in the health office, in the present instance, was of the birth of a child of " Joseph H. and Annie M. Comly ; " and this was, at least, an indication that its parents tacitly, if not directly, admitted its legitimacy. The competency of the claimant to testify as to the alleged contract of marriage was scarcely a material question. Her testimony was actually relied upon by the contestants, who now object to it, as perhaps the most vital to their own interests, in rebutting the presumption of a contract which arose from cohabitation and repute, by showing substantively that the attempt to make a contract had utterly failed. It was not essential to the issue, moreover, for the reason that the other proofs were amply sufficient to make out the claimant's case. But it was competent. Of course, where the parties are concluded by full proof of cohabitation and reputation, they cannot by their own oaths deny the fact of marriage. In Divoll v. Leadbetter, 4 Pick. 220, for instance, the husband, who held title to property in virtue of his marriage, was not permitted to defeat a claim against the joint estate by declaring that he was an uncle of his wife, and that the marriage was void under the state laws relating to consanguinity; in other words, he was not allowed to escape from an obligation by setting up his own turpitude. In Greenawalt v. McEnelley, 85 Pa. 352, PAXSON, C. J., stated the proposition of the wife's competency to testify as undoubted. It was taken for granted in Drinkhouse's Estate, 151 Pa. 294, where the widow had an indirect interest, and in Luce's Estate, 3 Pa. Superior Ct. 289, where she was herself the claimant. The Act of May 23, 1887, sec. 5, P. L. 159, settles the question by providing that where the inquiry concerns the property of a deceased owner, and is between parties respectively claiming such property by devolution on the death of such owner, all persons shall be competent witnesses. The parties to this proceeding, including the widow, claim by devolution under the intestate laws, and an inquiry into the status of any of them, which may affect the widow by involving the validity of her

marriage just as much as it may affect a child by involving the legitimacy of its birth, is certainly within the act.

'The exceptions are dismissed.

*Errors assigned* among others were (1–6) in finding that the marriage relation existed between the claimant and the decedent; (7–10) in rejecting testimony that the claimant had lived in illicit relations with other men prior to her alleged marriage with decedent.

*W. Horace Hepburn*, with him *John Shalcross*, for appellants.— In order to constitute a marriage contract the words must be in præsenti: Hantz v. Sealy, 6 Binney, 408.

In order to establish the presumption of a contract of marriage from evidence of cohabitation and reputation, it is necessary: (1) the two should live and dwell together, have the same habitation, so that where one dwells, there the other dwells also, to constitute cohabitation; (2) their reputation as man and wife should be general; it must be among the friends and relatives of the deceased, as well as those of the claimant. There can be no divided reputation carrying with it any such inference: Com. v. Stump, 53 Pa. 136; Bicking's App., 2 Brewster, 202; Yardley's Est., 75 Pa. 207; Tholey's App., 93 Pa. 36; Grimm's Est., 131 Pa. 201; Appeal of Reading Fire Ins. & Trust Co., 113 Pa. 204.

The evidence rejected should have been admitted: Drinkhouse's Est., 151 Pa. 298.

*Alfred D. Wiler*, for appellee.—The evidence was sufficient to sustain the finding that the marriage relation existed: Greenawalt v. McEnelley, 85 Pa. 353; Nathan's Case, 2 Brewster, 175; Strauss's Est., 168 Pa. 561; Physick's Est., 2 Brewster, 179; Chambers v. Dickson, 2 S. & R. 475; Covert v. Hertzog, 4 Pa. 145; Thorndell v. Morrison, 25 Pa. 326; Hill v. Hill, 32 Pa. 511; Kenyon v. Ashbridge, 35 Pa. 157; Guardians of the Poor v. Nathans, 5 Pa. L. J. 1; Hanna v. Phillips, 1 Grant, 253; Senser v. Bower, 1 P. & W. 450; Goodman v. Goodman, 28 Law J. Ch. 745; Doe v. Fleming, 4 Bing. 266; 1 Bishop on Marriage, Divorce and Separation, sec. 1064; Hamilton v. Hamilton, 9 Cl. & F. 327; De Amerelli's Case, 2 Brewster, 239;

Vincent's App., 60 Pa. 228; Com. v. Murtagh, 1 Ash. 272; State v. Seals, 16 Ind. 352; Squire v. State, 46 Ind. 459; State v. McDonald, 25 Mo. 176; Williams v. State, 54 Ala. 131; Cook v. State, 11 Ga. 53.

OPINION BY MR. JUSTICE WILLIAMS, March 28, 1898:

The facts brought to our attention by this record are of a very unsavory sort; but a question is raised upon them which compels their consideration.  The estate of Joseph H. Comly has been settled by Eleanor P. Comly, the administratrix, and the fund raised is now for distribution.  A woman appears alleging that she was the wife of the decedent, having been married to him about ten years before his death, and having cohabited with him during these years.  The marriage set up was not solemnized in the usual manner, but was entered into by a verbal contract made, as is alleged, between the claimant and Comly that they would take each other for husband and wife respectively, until death should separate them.  She testified distinctly to the making of the marriage contract, that Comly provided and furnished for her a house in which they lived and cohabited, that a child was subsequently born to them, and that he had openly acknowledged her to be his wife on many occasions, and the child to be his child.  There was much evidence given in the court below tending to discredit this story, and lead to the conclusion that the relation between Comly and the claimant was a meretricious one.  There was on the other hand considerable evidence that was fairly corroborative of the testimony of the claimant, and that tended strongly to show that Comly had recognized and spoken of the claimant as his wife on many occasions, and had recognized the child born after the alleged marriage as his own.  If this evidence was competent its value was to be determined by the court below by which it was given, and from it that court was to find whether the claimant was the widow of Comly entitled to share as such in his estate, or was an impostor having no claims whatever upon it.  The assignments of error from the sixth to the tenth inclusive are directed to the rejection of offers to show that prior to the alleged marriage with Comly in October, 1885, the claimant had lived in illicit relations with one William Conn and other persons.  This evidence did not tend to

contradict her story of the marriage with Comly, and it seems to have been offered for that purpose. Her fidelity to Comly during the ten years between the alleged marriage and his death was not attacked. She lived during these years in a home provided by him, cohabited with him, and was known in the circle in which she moved as his wife. Her previous misconduct could not diminish the value of these circumstances and when offered for that purpose was properly rejected. The remaining assignments allege error in the court below in finding as a fact from all the evidence that the marriage between the claimant and Comly actually took place as claimed by her. There was evidence properly before the court from which this finding could be made. There was also a mass of circumstances shown by the testimony that seemed to indicate that the relation existing between these parties was an illicit one. The court below had the witnesses before them and could judge of their credibility. They have after a careful consideration of all the testimony given credit to the claimant. We are asked to say that this was error. It certainly was not a mistake in law. If it was a mistake in reaching a conclusion of fact the burden is on the appellants to point out the mistake clearly. It is not enough to demonstrate that the fact is doubtful. It is not enough that the finding appears to be against the balance of the testimony. Nor yet is it enough that we may think we would have reached a different conclusion if the question had been for us to decide in the first instance. The court below had, as we have not, the witnesses before them, and were therefore better able to say to whom credit ought to be given and from whom it ought to be withheld, than we can be. Their findings of fact must stand therefore until the appellant shall point out to us clearly the mistake of which he complains.

We are unable in view of these considerations to reverse the findings of the orphans' court and for this reason the decree resting on their findings is affirmed. The costs of this appeal to be paid out of the fund.