# Craig's Estate.

*Husband and wife—Marriage—Evidence—Contract—Reputation —Cohabitation — Meretricious relation — Presumption — Child — Claim against father's estate—Burden of proof.*

1. Marriage is a civil contract, and does not require a particular form of solemnization by church or state officials to make it valid.

2. As a contract, however, it must be evidenced by words in the present tense uttered with a view to establish the relation of husband and wife, and should be proved by the signature of the parties, if in writing, or by witnesses who were present when the contract was made.

3. If such evidence is not available the marriage may be established by proof of reputation and cohabitation, declarations and conduct of the parties and such other circumstances as usually accompany the marriage relation.

4. Neither cohabitation nor reputation alone is sufficient. Both must coexist when there is no proof of actual marriage, and together they are evidence from which a presumption of marriage arises which presumption is always open to rebuttal by proof that no marriage had, in fact, taken place.

5. A man may live with his kept mistress in such a way as to create a kind of reputation of marriage among some persons; he may even allow himself to be held out to her friends and acquaintances as her husband, may recognize her children as his, and yet the evidence may fall short of that which ought to satisfy the mind that there was an actual agreement to form the lawful relation of husband and wife.

6. The conduct of the parties must be such that almost any one acquainted with them would naturally infer that they bore the relation to each other of husband and wife.

7. While a man may recognize the parentage of a child, yet, if such child after the father's death claims a share in his estate, the burden is on the claimant to prove a valid marriage existing between the parents.

8. In the present case the evidence was held insufficient to establish such marriage.

Argued January 17, 1922. Appeal, No. 142, Jan. T., 1922, by Edith Craig Werner, claiming as daughter, from decree of O. C. Phila. Co., dismissing exceptions to auditor's report, in estate of Hugh Craig, deceased. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Exceptions to report of Hampton L. Carson, Esq., auditor.

The opinion of the Supreme Court states the facts.

Exceptions dismissed by majority of judges, HENDERSON, J., dissenting. See 30 Pa. Dist. R. 521. Edith Craig Werner, claiming as legitimate daughter. appealed.

*Error assigned,* inter alia, was decree, quoting it.

*W. W. Porter,* of *Porter, Foulkrod & McCullagh,* for appellant.—The evidence was sufficient to establish a contract of marriage: Comly's Est., 185 Pa. 218; Nathan's Case, 2 Brewster 158; Hines's Est., 10 Pa. Superior Ct. 124; Richard v. Brehm, 73 Pa. 140; Com. v. Haylow, 17 Pa. Superior Ct. 541.

A legitimate child is the offspring of married parents. The legal presumption in favor of legitimacy is necessarily a presumption in favor of marriage: Picken's Est., 163 Pa. 14; McCausland's Est., 213 Pa. 189; Wile's Est., 6 Pa. Superior Ct. 435; Thewlis's Est., 217 Pa. 307; Homeyard's Est., 26 Pa. C. C. R. 281.

*M. B. Saul,* of *Saul, Ewing, Remick & Saul,* with him *Joseph A. Lamorelle,* for appellee.—The evidence does not establish a marriage between appellant's mother and

Hugh Craig, Jr.: Com. v. Cronin, 13 W. N. C. 76; Com. v. Stump, 53 Pa. 132.

The evidence produced does not establish cohabitation and reputation, and there is therefore no presumption of marriage: Bicking's App., 2 Brewster 202; Greene's Est., 5 Pa. C. C. R. 605.

No presumption of marriage can arise from cohabitation and reputation since the evidence clearly proves that the parties were not married.

There can be no presumption of legitimacy, as the evidence clearly proves there was no marriage, either actual or presumed: Wharton's Est., 218 Pa. 296.

OPINION BY MR. JUSTICE FRAZER, April 10, 1922:

Hugh Craig, Sr., died in 1878, leaving a will in which he created a trust for the benefit of his four children and provided that "In the event of the death of either or any of my said four children leaving issue more than one child, I direct the said trustees to pay over to such issue their deceased parent's share of the said net income, but if the said issue be one child only, then I direct the said trustees to pay over to such child only one half of its deceased parent's share of the said net income, and to pay the remainder thereof to my surviving children in equal shares." Hugh Craig, Jr., one of the children named, died in 1913 and Edith Craig Werner, appellant, claiming to be the only child of Hugh Craig, Jr., filed a petition asking that the trustees be ordered to file an account and pay over to her one-half her deceased father's share of the income under the above clause of her grandfather's will. The trustees answered denying petitioner's legitimacy as a child of Hugh Craig, Jr., averring that he died unmarried and without issue and, furthermore, that a claim formerly made against the estate by petitioner and her mother, claiming to be the child and widow, respectively, of the deceased, had been compromised and released for the sum of $2,500. The matter was referred to Hampton L. Carson, Esq., as

master, to hear the testimony and in due time his report was filed in which he found that no lawful marriage had existed between Hugh Craig, Jr., and Elizabeth Cullen, the mother of Edith Craig Werner, that the latter was not a legitimate child of deceased and that there was a legal compromise of the claim of the alleged widow and child. On exceptions filed, the report of the master was sustained by the court below and Edith Craig Werner appealed. No claim was made by appellant's mother in this proceeding and she was, accordingly, permitted to testify on behalf of her daughter.

To establish her claim, appellant relied upon the theory that a common law marriage contract had been entered into between decedent and her mother, and, in support of this contention, a large mass of testimony was taken and fully considered and discussed by the master in a most elaborate report in which he carefully weighed the proofs offered in support of and against the theory that a valid marriage existed. If it be conceded that the case is one where there is room for an honest difference of opinion as to the conclusions to be reached, this difference is due mainly to the inferences to be drawn from the facts rather than any question as to the principles of law involved. These principles are well settled. Marriage is a civil contract and does not require a particular form of solemnization by church or state officials to make it valid; but as a contract it must be evidenced by words in the present tense uttered with a view to establish the relation of husband and wife and should be proved by the signatures of the parties, if in writing, or by witnesses who were present when the contract was made: Com. v. Stump, 53 Pa. 132. But if such evidence is not available, the marriage may be established by proof of reputation and cohabitation, declarations and conduct of the parties and such other circumstances as usually accompany the marriage relation: Richard v. Brehm, 73 Pa. 140. Neither cohabitation nor reputation alone is sufficient, however. Both must co-

exist when there is no proof of actual marriage and together they are evidence from which a presumption of marriage arises, which presumption is always open to rebuttal by proof that no marriage had, in fact, taken place: Richard v. Brehm, supra; Com. v. Haylow, 17 Pa. Superior Ct. 541. In considering the effect of evidence offered to prove marriage by cohabitation and reputation, it is necessary to bear in mind the following language in Bicking's App., 2 Brewst. 222: "If a man and woman live together as husband and wife, are reputed to be such by their acquaintances, are visited and recognized by the friends of both parties, attend together places of worship or of public amusement, call each other and are called by the same name, and educate and recognize their children as legitimate,—a marriage proved to have been solemnized in facie ecclesiæ would not be more satisfactorily shown. On the other hand, a man may live with his kept mistress in such a way as to create a kind of repute of marriage among some persons; he may even, to gratify her, allow himself to be held out, and hold himself out to her friends and acquaintances, as her husband, may be a constant visitor, sleep, and often eat at her house, may recognize the fruit of the connection as his children, and manifest affection and tenderness towards them; yet the evidence may fall short of that which ought to satisfy the mind that there was an actual agreement to form the lawful relation of husband and wife. The conduct of the parties must be such that almost any one acquainted with them would naturally infer that they bore that relation to each other."

Previous to the time of the alleged marriage in 1869, Lizzie Cullen had been living at a house of doubtful reputation where she was maintained by another man. This was known to Hugh Craig, Jr., and at the time they entered into the agreement hereafter referred to he took over the house and continued to maintain her there. He was well known in exclusive social circles and informed none of his friends of his alleged marriage, for

the reason he could not introduce to them the person who claimed to be his wife. He lived with his parents and was known as a bachelor and apparently took precautions to prevent his friends from suspecting the contrary, even addressing letters to his alleged wife in the name of Mrs. L. Scott. The proof of the marriage consisted of the following testimony of the alleged wife: "Q. Now, what was said by your husband and you at that time? A. He said, 'I don't want you to ever use your name again; this is your name; you are my wife; and I want you to thoroughly understand that'; and I agreed with him thoroughly. Q. Mrs. Craig, I notice you have a ring on the third finger of your left hand. A. Yes, sir. Q. What was done with the ring on the occasion you mentioned? A. He gave me the ring to put on my finger the night we were married; it is inscribed inside; and I am sorry I cannot get it off my finger; my finger is so swollen I cannot get it off. I tried to get it off; my finger is very much swollen. Q. What is the inscription? A. H. C. Jr., to L. C., 1869. Q. How long have you worn that ring and how steadily? A. From that until to-day...... Q. What brought up the subject of marriage, if you can recall? A. Well, the subject had been talked over before and he said that he would marry me and he did, and Miss Worrell told him that he was a fool, and he said he was not, that he wanted me considered his wife, I was his wife, and he wanted everybody to know it. Q. Can you recall now his exact language on that occasion? A. I don't suppose I can recall every word exactly, but that is the purport of it; that is as far as I can remember. Q. He had the ring with him at that time? A. He had the ring; he promised me the night before when he called he would bring the ring and he did." The witness, Miss Worrell, has since died and the above is the sole evidence of what took place. It will be observed that the words used do not clearly show a contract of marriage in words of either the present or of the future tense. She testified further that they entered

upon their marriage relations from that time. Her testimony is supported by certain important facts which are undisputed and which are as follows: A child, the present appellant, was born in 1886 and entered in the official record of births and deaths at his request as Edith Craig, child of Hugh and Lizzie Craig, the return having been made by the attending physician. There is other evidence of acts on the part of Craig in recognition of the child as his own and in later years there was correspondence between them which recognized the existence of the relationship of parent and child. In a neighborhood in which they lived, appellant's mother was known as Mrs. Craig and while Mr. Craig was absent frequently there was nothing to indicate the parties were other than a respectable married couple. All this occurred while they resided at 1837 Mervine Street, Philadelphia, between 1882 and 1889. Had there been nothing to contradict this testimony during the preceding thirteen years or the succeeding twenty-four years, until the death of Craig, we would be constrained to hold that agreement, followed by cohabitation and reputation, sufficiently established the marriage relation between the parties. But the effect of the foregoing testimony is greatly weakened by other facts and circumstances which throw quite a different light upon the true relationship existing between the couple. During the period of time from 1869 to 1882, the testimony is meagre as to cohabitation between them as man and wife or any reputation of marriage in the neighborhood in which they lived. He maintained her at various places, but played the rôle of visitor rather than husband. As to this period we think the master was justified in his finding: "There is a dearth of evidence as to the maintenance of a joint residence by Hugh Craig, Jr., and Elizabeth Cullen as man and wife and not the slightest evidence of cohabitation and reputation as such in either neighborhood outside of the alleged wife's unsupported statements." During the later period from 1889 to 1913 when Craig died, the alleged

wife lived in Washington with their daughter, the appellant. During this period of twenty-four years there was no attempt to prove, by third persons, cohabitation and reputation and the testimony relied upon is that of appellant and her mother and some thousands of letters which passed between the latter and Craig. During this time he continued to reside in Philadelphia and visited them at Washington two or three times a month. A house was bought there and at Craig's suggestion taken in the name of Mrs. Scott and all letters from Craig were addressed to her in the same name, although she testified that on all other occasions she used the name of Craig. The most important evidence of the relationship between them is to be found in the letters which passed from one to the other, of which there were 4,046 in all. It is somewhat remarkable that nowhere in these letters is the word husband or wife used and their general tone is not such as one would expect to find in letters between husband and wife, but are much more consistent with the relation of man and mistress.

While the letters between Craig and appellant indicate the relationship of father and child, this adds little weight to the theory of the legitimacy of the child. The question is not as to the paternity of appellant. That is conceded. Counsel for appellant argues the question here is one of legitimacy and that the burden is on respondent to overcome the presumption of legitimacy by clear and satisfactory facts. In this case, however, the question of legitimacy depends solely upon whether a valid marriage existed between the parents of the child and the proof of this fact must measure up to the standard applied in such cases. The real question for determination is whether appellant is the legitimate child of Hugh Craig, Jr., and this in turn must depend upon whether the parents were lawfully married. On this question, after a careful review of the evidence, we are not convinced the master erred in concluding that while there was evidence of cohabitation while the parties

lived on Mervine Street, the effect of this favorable evidence was destroyed by earlier and subsequent events and the letters which passed between them during the twenty-four years immediately preceding his death, and brought the parties within the language of Bicking's Appeal, supra, to the effect that a man may live with his mistress in such a way as to create a limited reputation of marriage and yet the evidence may fall far short of showing sufficient circumstances to satisfy the mind of an actual agreement of marriage between them.

The cases relied upon by appellant are distinguishable on their facts. Of these, Vincent's App., 60 Pa. 228, is very similar to this but contains clear proof of cohabitation and reputation as man and wife in the circle of her acquaintances and the neighborhood in which they lived, with nothing in the subsequent conduct of the parties themselves to destroy the effect of this evidence. Stevenson's Estate, recently decided by this court [272 Pa. 291], is an illustration of the heavy burden of proof which the law imposes upon one who claims a part of the estate of a decedent as his common law wife. We there said that "when the lips of a man are sealed by death, and he leaves no satisfactory evidence as to the existence of such contract, courts will be very slow to establish it in derogation of the undoubted rights of those who follow him." While it is true in that case the marriage agreement relied upon was preceded by illicit relations covering a long period of time and which imposed upon claimant the burden of showing a change in the relationship—a burden which did not exist in this case—yet there still remained in each case the burden of proving the contract of marriage. The proof of cohabitation and reputation in Stevenson's Estate was to the effect that claimant was known as Mrs. Stevenson among her own relatives and to the trades people and other residents of the neighborhood in which she lived, yet, in discussing the evidence, we said the purpose was apparently for the intention of deceiving the public and making their continued illegal

relations easier. That conclusion is particularly applicable to the evidence of cohabitation and reputation in the present case, when considered in view of the lack of such proof prior and subsequent to the comparatively short period to which the proofs relate. We find no cause for interfering with the conclusions of the court below: Stevenson's Estate, supra.

The decree of the court below is affirmed at costs of appellant.