## Wallower's (also known as Ulmer) Estate.

*Decedents' estates—Marriage—Sufficiency of evidence—Presumption of death—Spouse's $5000 preference under the Intestate Act of June 7, 1917.*

1. One claiming, as the surviving spouse of a decedent, the $5000 preference given by section 2 of the Intestate Act of June 7, 1917, P. L. 429, as amended by the Act of July 11, 1917, P. L. 755, must show actual marriage, or, in the alternative, such circumstances as would in law raise a presumption of marriage.

Sufficiency of evidence to establish marriage considered and authorities analyzed by Gest, J., Auditing Judge.

*Findings of fact by Auditing Judge.*

2. The findings of fact by an auditing judge will not be reversed by the court *in banc* without the clearest and most convincing proof of error.

Exceptions to adjudication. O. C. Phila. Co., Jan. T., 1924, No. 20.

The facts appear from the following extract from the adjudication of Gest, J., Auditing Judge:

The only estate of the decedent consisted of a sum of money deposited in the Doylestown National Bank on Oct. 6, 1908, in the name of Ella N. Ulmer, amounting, with interest, to date of decedent's death, to $3520.62, and the balance for distribution appearing by the account to be less than $5000, is claimed by George Wallower, as surviving husband, under section 2 of the Intestate Act of 1917. . . .

The question was whether or not George Wallower was the legal husband of the decedent at the time of her decease.

The case is unusual and, indeed, peculiar in its facts. The claimant testified that the decedent had been the wife of one John Harry Johnson and lived with him in Philadelphia, the exact place of residence not appearing in the testimony. George Wallower lived with the Johnsons, who were friends of his, for about a year, and in the year of 1893, as nearly as I can fix the date from the testimony, Johnson, who was an intemperate man, came home drunk and abused his wife, who had him arrested, and, in consequence, they separated. Mrs. Johnson went for a few days to relatives in Bucks County and Wallower opened a laundry business at No. 3327 Woodland Avenue, to which place Mrs. Johnson came as housekeeper and assistant in the business, and he gave her money every week, some of which she saved. They lived in the house together alone, but, as he testified, they occupied separate rooms. In the second week of June, 1896, according to Wallower's testimony, they had occasion to go to Chester on some unimportant business and were seated behind a man of clerical appearance, who was reading a book which Wallower thought was a Bible. Wallower asked him if he was a marrying minister, and, on receiving an affirmative reply, asked him if he would marry the claimant and the decedent, stating that they wanted to be married in Chester under a large tree, according to what was said to be a tradition in the claimant's family. The clergyman, who said he was a Presbyterian minister, assented, so they all got off the train at Chester, and after walking into the suburbs of the town, found a suitable tree and stood up before the minister, who said, "Do you take this woman as your wedded wife," to which the claimant answered, "Yes," and then the minister said to the decedent, "Do you take this man as your wedded husband," and she answered, "Yes." The minister then read some Scriptures and Wallower handed to him a ring, which the minister put on Mrs. Johnson's finger, at which time, the claimant said, "I wed you with this ring." The minister gave his name as J. R. Exton, and wrote a certificate on the fly-leaf or blank page of his book and gave it to the decedent, who took it home with her. There was no license procured for the wedding and

Wallower's (also known as Ulmer) Estate.

no inquiry was made by the minister concerning it. The claimant testified that after their marriage in Chester they lived together as man and wife. After three years had elapsed, on Sept. 18, 1899, he bought No. 3410 Sansom Street and lived there with the decedent until her death in 1921, sustaining continuously, as he said, the relation of husband and wife. On Oct. 6, 1908, the decedent, accompanied by the claimant, took to the Doylestown National Bank $2500 in gold, which had then accumulated, and deposited the same in that bank, receiving a certificate of deposit in these words:

"Doylestown, Pa., Oct. 6th, 1908.

"No. 16485

"THE DOYLESTOWN NATIONAL BANK

"Ella N. Ulmer................has deposited in this bank
"Two Thousand five hundred.....................Dollars.
"Payable to the order of Self,
"on return of this Certificate.
"If left 1 month 3 per cent. interest per annum.
                    "Not subject to check.
"$2500                                "ELMER E. FUNK for
                                            "Cashier."

This deposit, with interest, in the total sum of $3520.62, constituted the fund in dispute and was paid over, after the death of the decedent, to Wallower, administrator of her estate. The claimant was present, or was at least in a position to hear what passed between the decedent and the teller of the bank, but, according to his testimony, he did not know that that deposit was in the name of Ella N. Ulmer until three months afterwards. He testified that he made some endeavor to have the name changed in the certificate of deposit, but, on account of her agitation and nervous condition at certain periods, the matter does not seem to have been pressed, and after her death he took out letters of administration and, after some difficulty, the deposit was paid over to him as administrator.

From this brief outline of the case, derived in great measure from the claimant's own testimony, it will be seen that he maintains that he was legally married, *per verba de presenti*, by a clergyman at Chester on a Wednesday in the second week of June, 1896, to Ella Johnson, as the widow of John Harry Johnson, and lived with her as her husband until her death. Assuming for the present that the marriage ceremony was so performed, the first important question is whether or not Johnson was dead in June, 1896. That he was the husband of Ella Ulmer cannot be doubted; for this fact appears from the claimant's own testimony, and no one was produced to dispute it. There is no positive testimony that he is not living at the present time, but it was argued that the presumption of death has occurred. According to the claimant's testimony, Johnson was certainly alive in 1893 when his wife left him on account of his abuse of her, and no presumption of his death could arise until 1900, seven years after he left his home, and, consequently, at the time of the marriage ceremony he must, in the absence of other testimony, be presumed to be still living in 1896. The claimant, indeed, testified that Sam Ulmer, a brother of the decedent, told the claimant that Johnson was dead, but, unfortunately, this Sam Ulmer is dead himself, and, indeed, according to the testimony of Samuel B. Ulmer, whose wife, Martha, is a sister of the decedent, the said Sam Ulmer died many years before the date at which the conversation could have taken place, which claimant fixes at a time when he was living in the Woodland Avenue house. The claimant also testified that about

two years ago he went to Doylestown and saw one Fannie Johnson, a sister of John Harry Johnson, and she told him that they had not heard anything from her brother for many years, and they did not know whether he was dead or living. From the utterly vague testimony on the subject, I am not able to find that Johnson was dead in 1896, or that any presumption of his death occurred until 1900, and, consequently, the marriage ceremony of 1896, if, indeed, it occurred, was invalid. The cases cited by the learned counsel for the claimant, McCausland's Estate, 213 Pa. 189; Wile's Estate, 6 Pa. Superior Ct. 435; Com. v. May, 77 Pa. Superior Ct. 40, involved the rights of issue as legitimate offspring, and McCausland's Estate was distinguished in Baker v. Trust Co., 55 Pa. Superior Ct. 15, on that very ground. If, indeed, the claimant and the decedent were actually married in 1896, and if there was positive testimony that Johnson is actually dead, and if the testimony further showed that after his death the parties lived together as husband and wife, the doctrine of Thewlis's Estate, 15 Dist. R. 361, 217 Pa. 307, might apply, but that case is distinguishable in its facts.

I now return to the proof of the marriage ceremony celebrated in June, 1896, between the claimant and the decedent, which rested entirely upon the claimant's own testimony and was certainly peculiar. In substance, it was that for three years prior thereto the parties lived together at No. 3327 Woodland Avenue as employer and employee and occupied separate rooms. Their marriage had been discussed and at Christmas-time, 1895, he purchased a ring for a Christmas present, but did not give it to her, keeping it for wedding purposes.

The trip to Chester was not with a view of being married there, but for a trivial errand. However, on the journey, the claimant accosted an entire stranger, who appeared to be and said he was a minister, and who agreed to marry them at Chester. The claimant stated his desire to be married under a tree, according to a tradition in his family, although it would appear that the decedent, when marriage had been suggested, indicated a preference for the Little Church Around the Corner in New York. A suitable tree was soon found, the parties stood up before the minister and were married by him, *per verba de presenti*. No license was obtained or mentioned by any one; no witnesses were present; the minister wrote a certificate on the blank leaf of his book or Bible and gave it to the decedent, but it was afterwards lost. The minister's name was said to be J. R. Exton, but no corroborative proof was presented of the existence of such a person as a minister of the Presbyterian or any other church, nor was there any testimony whatsoever to corroborate the story in any particular. It was not, indeed, contradicted by any testimony, nor, in the nature of things, could it be contradicted, but I do not think it follows that an auditing judge is bound to accept it as final, in the absence of corroborative facts. Marriage is an institution of such very great importance, not merely to the parties themselves, but to society at large, that it is not unreasonable to require its proof to be at least somewhat proportioned to its gravity. There is nothing easier than to get married in the form prescribed by law and conformable to the customs of the community. The license is cheap and readily obtained, and the records kept in the Marriage License Bureau afford a ready and permanent proof of the performance of the ceremony. Magistrates are plenty enough, and clergymen still more abundant, and little churches around the corner might readily have been found in the neighborhood of No. 3327 Woodland Avenue. When, with all these facilities, the claimant, according to his own story, deliberately selected a method of matrimony which, to say the least, is most extraordinary, he should not be

surprised if his narrative, without more, fails to carry conviction. And yet it might be accepted if the testimony of their subsequent life was clear and satisfactory with regard to their cohabitation and reputation as man and wife. These people lived together until 1921, when death separated them, and during these twenty-five years they resided, until 1899, at No. 3327 Woodland Avenue, and thereafter, until 1921, at No. 3410 Sansom Street, in the near neighborhood; but although they must have had business or social relations with scores or perhaps hundreds of persons, not one was produced to testify that these parties were known as husband and wife or introduced each by the other as such. The only witness of this nature produced by the claimant was a grand-niece by marriage of the decedent, with whom he is now living, and who visited No. 3410 Sansom Street and called the parties uncle and aunt. Whatever this amounts to is offset by the testimony of other members of the family, and certainly it cannot be argued that the parties enjoyed that general reputation of marriage which all the cases say is essential.

The claimant, indeed, testified that the decedent received hundreds of letters addressed to "Ella Wallower," some of which referred to the claimant as her husband, but they were not produced. The conduct of the decedent in making the deposit in the Doylestown Bank in 1908 is certainly significant, for she made the deposit, not in the name of Ella Wallower, as she naturally would have done had she been the wife of George Wallower, but in the name of Ella N. Ulmer. Why she omitted her prior marriage name of Johnson can only be surmised. Perhaps, very likely, the name was not agreeable to her, but, at any rate, she ignored the name of Wallower, although accompanied by the claimant himself. This, at all events, showed she did not want to be known by his name. Taking this case as a whole, I cannot find sufficient evidence to enable me to find that George Wallower was the legal husband of the decedent at the time of her death, and his claim as such is dismissed.

Judge Gest awarded the fund to the actual heirs and next of kin. . . .

*William O. Armstrong*, for exceptant; *Fred J. Shoyer*, contra.

LAMORELLE, P. J., May 22, 1925.—One claiming as surviving spouse of an intestate the $5000 preference given by section 2 of the Intestate Act of 1917 must show actual marriage or, in the alternative, such circumstances as in law raise a presumption of marriage: Wandall's Estate, 29 Dist. R. 1132. Measured by this standard, the Auditing Judge finds that the claimant has not made out his case.

Notwithstanding the able argument of the exceptant, we are not convinced that this ruling should be reversed. Says Mr. Justice Fell, in Furbush's Estate, 220 Pa. 166 (at page 167): "Findings of fact will not be reversed by an appellate court without the clearest and most convincing proof of error. The credibility of witnesses, the weight to be given to their testimony because of their character, intelligence and knowledge of the subject can be much better determined by the judge who hears them than by us, and we should be in danger of falling into grave error in substituting our judgment for his: Steinmeyer v. Siebert, 190 Pa. 471." See, also, Comly's Estate, 185 Pa. 208; Gongaware's Estate, 265 Pa. 512; Grollman's Estate (No. 1), 273 Pa. 559; and Kull v. McCleman, 2 D. & C. 517.

Moreover, the only written evidence submitted was at variance with the oral testimony of the husband.

Accordingly, the exceptions are dismissed and the adjudication is confirmed absolutely.