A. L. R., 1374; *Cogliano* v. *Ferguson*, 245 Mass., 364, 139 N. E., 527.

In all essential particulars, the case at bar is on all fours with the case formerly decided by this court. If any distinction is to be drawn between the two cases, the one at bar is a stronger case in favor of the insurance company, for in the case now under consideration no notice whatever was given to the insurance company at any time before judgment.

For the reasons given, the judgment will be affirmed.

*Judgment affirmed.*

WILLIAMS and YOUNG, JJ., concur.

---

HOWARD *v.* THE CENTRAL NATIONAL BANK OF MARIETTA ET AL.

*Husband and wife—Common-law marriage—Relation determined by law of state where consummated—Marriage relation established by cohabitation and reputation and conduct of parties—Such evidence admissible, although party testifies to contract—Statements that parties formally married, not inconsistent with informal marriage—Statement of man a declaration of marriage in verba presenti, when—Expression by man and acquiescence by woman sufficient, when—Proof of common-law marriage unaffected by later adulterous conduct—Delay in asserting common-law marriage not conclusive against woman, when.*

1. Existence of common-law marriage is to be determined by law of state where it was consummated.

2. Evidence of cohabitation and reputation and conduct of

parties, without the testimony of surviving party, *held* satisfactory proof of common-law marriage.

3. Evidence of cohabitation and reputation is admissible in favor of child of parties to prove common-law marriage, though surviving party testifies to terms of contract.

4. Though the surviving party to claimed common-law marriage testifies to terms of contract, evidence of cohabitation and reputation and practical construction by parties is admissible in woman's favor; she not testifying arrangement was not a marriage and ensuing cohabitation meretricious, but to an agreement of doubtful import.

5. It is not necessarily inconsistent with informal marriage in fact, but only tends to show parties were ashamed of unconventional method adopted, that they said they had been married by official.

6. Under the circumstances, there being no evidence of illicit relations, and nothing secretive about the parties' relations, *Held,* in view of public policy, that the man's ambiguous declaration to the woman, "Now we are man and wife," should be treated as a declaration of his marriage in *verba de presenti*, and not an expression of his opinion of the legal effect of his proposal.

7. To consummate marriage by *verba de presenti*, such words need not be used by both, but the expression thereof by the man, and the acquiescence by the woman, is enough.

8. Effect of proof of common-law marriage is not destroyed by the man's later adulterous career with another woman.

9. Delay of woman after death of man who had deserted her to assert common-law marriage to him is not conclusive against her, but only a circumstance to be considered.

(Decided February 20, 1926.)

ERROR: Court of Appeals for Washington county.

*Mr. David Warren Jones,* and *Messrs. Thorp, Bostwick, Stewart & Reed,* for plaintiff in error.

*Mr. E. B. Follett,* and *Mr. L. C. Barton,* for defendants in error.

MAUCK, P. J.  Harry B. Hulings, a resident of

Washington county, died intestate in September, 1922, leaving an estate of some $30,000. Thereupon a woman known as Maud Hulings was appointed administratrix of his estate on the supposition that she was the common-law widow of the decedent. Some time later one of the defendants, to be known herein as Lulu Hulings, appeared, and represented herself as the widow of the decedent, as a result of which the first-appointed administratrix resigned her trust, and the Central National Bank of Marietta was appointed administrator *de bonis non* of the estate. The pleadings show that the estate has been administered, and that a large sum is now in the hands of the administrator awaiting the determination of the next of kin entitled to share in the distribution. A petition was filed in the common pleas by Elizabeth Hulings Howard, alleging that she is a sister of the decedent, and that she and another sister and three surviving children of a predeceased brother are such next of kin of decedent, who, she pleads, left no widow surviving him. She avers, however, that one Lulu Cochran (Lulu Hulings) claims an interest in the estate, and asks that she (the plaintiff) and her sister and the three children of her deceased brother be found to be entitled to the estate, and that the said Lulu be adjudged to have no interest therein. Thereafter Lulu Hulings filed her answer, setting up her claim to be the widow of the decedent. It then appeared that Harry Hulings Schaffer, a minor residing at Pittsburg, Pa., was the surviving son of Frances Margaret Hulings, who had been married to Charles E. Schaffer, and that said Frances Margaret was the daughter of the deced-

ent and said Lulu Cochran Hulings, and had died, leaving the said Harry Hulings Schaffer her only child. Thereupon the Pennsylvania Trust Company of Pittsburg, which seems to be the guardian of that child, somehow appeared in the case without service and without pleading. The Central National Bank, as administrator *de bonis non* of the estate of Harry B. Hulings, filed its answer, admitting the conflicting claims of the parties, and asking that it be instructed by the court as to its duties in the premises. It appears there was another case pending in the common pleas at the same time, arising through exceptions filed to the account of the administrator *de bonis non* in the probate court, to which account exceptions had been carried to the common pleas by appeal, raising the same question sought to be raised in the action already referred to as originating in the common pleas. The two cases are here together, the sole questions at issue being whether or not Harry Hulings Schaffer is the surviving grandson, and Lulu Hulings the widow, of the decedent, these questions hinging on whether or not a common-law marriage had subsisted between Lulu and the decedent. The trial court found that such common-law marriage did exist, and entered judgment accordingly. To reverse that judgment this case comes into this court by a proceeding in error.

To perfect the record it is now ordered that the Pennsylvania Trust Company file its cross-petition asserting the interest of its ward in the property in accordance with the judgment now under review.

Lulu Hulings appeared as a witness, and, with-

out objection, testified to an unusual chain of circumstances, briefly epitomized as follows:

She was born and brought up on Neville Island, an island some 12 miles from Pittsburg. In 1885 her father went to work for Harry and Ed Hulings; Harry being the decedent in this case. Hulings Bros. were operating a steamboat that brought them to the island, and kept them there more or less. In August, 1885, the decedent, then a widower, came to the Cochran home, and there the parties met. Lulu was at this time 23 years old, Harry but a little older. Lulu's family consisted of her parents and two younger brothers. Harry called at the home on three of the four days following, and on the fourth day asked Lulu to break off an engagement she had to marry another man, and this she did about three weeks thereafter. About Christmas of that fall they became engaged to be married. This engagement seems to have continued up until the fall of 1886, when Hulings inquired: "We are going to be married some day?" Lulu answered in the affirmative. He then said: "We are united from above."

He followed this declaration with a proposal that the two live together as man and wife without a religious ceremony. The record then proceeds:

"Q. What else was said about that? A. I refused, and asked him why, and he said, 'unions like ours was made in Heaven,' and that we loved one another, and, if we lived, we would be man and wife. I objected at first, but finally consented.

"Q. What, if anything, did he say about that kind of marriage? A. He said that, and he took

my hand and he said, 'Now we are man and wife,' and he kissed me, and after that we went in to my mother—of course, he had talked about marriage so much—and he told my mother we had gotten married, and she said she wasn't surprised, and he put his hand on my shoulder, and my mother shook hands with us and kissed us both.

"Q. What did he tell you about the ways of getting married? A. Well, he said if he did get married no one would know about it; that the boys on the island were going to take him away down the river. They knew he was going to marry me, for he had told them.

"Q. Did he say what he meant by 'taking him away?' A. Was going to serenade him.

"Q. What, if anything, did he say to you about that way of being married—whether or not it was legal or proper? A. He said it was legal.

"Q. What, if anything else, did he say, if you can recall? Tell us just what his words were, if you can remember what was said. A. Of course, I did tell you. He said a marriage like ours was made in Heaven.

"Q. I mean anything you have not told. A. He said that we are now man and wife."

It is agreed that the relation between the parties is to be determined by the laws of Pennsylvania, where the marriage was consummated if consummated at all. This is perhaps of no great importance, except in the fact that Pennsylvania is one of the states that recognizes a common-law marriage, but the essentials of such a union in that state, so far as the instant case is concerned, are probably not different from those of this state. In

Ohio such a marriage must be established by clear and convincing evidence. *Umbenhower* v. *Labus,* 85 Ohio St., 238, 97 N. E., 832. In Pennsylvania the court must be entirely satisfied. *In re Stevenson's Estate,* 272 Pa., 291, 116 A., 162. In Ohio a contract of marriage *per verba de futuro,* followed by cohabitation, does not constitute a marriage (*Duncan* v. *Duncan,* 10 Ohio St., 181), while in Pennsylvania such an agreement will be sustained as marriage (*In Matter of Estate of Comly,* 185 Pa., 208, 39 A., 890). In Ohio a contract *per verba de presenti* has been sustained only in cases where cohabitation followed. *Carmichael* v. *State,* 12 Ohio St., 553; *Umbenhower* v. *Labus, supra.* In Pennsylvania such a contract is sustained whether followed or not by cohabitation, *Comly case, supra; Commonwealth* v. *Gamble,* 36 Pa. Super. Ct., 146. In both states a marriage may be shown by the conduct of the parties.

In Ohio, in *Bruner* v. *Briggs,* 39 Ohio St., 478, it is said: "It is now too well settled to admit of dispute that in all civil actions, when the rights to succession of an estate depend on the existence of a marriage, it may be proved by reputation, declarations and conduct of the parties."

In Pennsylvania, in *Craig's Estate,* 273 Pa., 530, 117 A., 221, citing *Richard* v. *Brehm,* 73 Pa., 140, 13 Am. Rep., 733, it is thus stated: "The marriage may be established by proof of reputation and cohabitation, declarations and conduct of the parties and such other circumstances as usually accompany the marriage relation."

There is an abundance of evidence in this case tending to establish such cohabitation and reputa-

tion as to warrant the presumption that the marriage relation existed between these parties. The neighbors recognized Lulu as Mrs. Hulings. She was so introduced by Hulings. He wrote to her as his "dear wife" scores of times. She joined with him in procuring a loan on the household furniture. She joined as his wife in executing a deed to property inherited by him. He joined as her husband in conveying land inherited by her. He paid her bills, lived with her for years in such a way that her marital status was not questioned by their associates, and even to such extent that his own sisters were surprised to learn after many years that no ceremonial marriage had ever occurred. Moreover, in 1912, when it was to his interest to show that he was a resident of Marietta, he so testified in a deposition, adding that his wife (meaning Lulu) was living in Pittsburg, but that he was not living with her. Under these circumstances a daughter was born, who was known by the name of Hulings, and was given the name of Hulings' mother. She grew to womanhood under that name, was married as a Hulings, and, dying, left the son, Harry Hulings Schaffer, grandson, and sole descendant of the decedent, unless his mother be deemed illegitimate. Without reviewing in detail all the evidence in this behalf, we need only to say that it would, of itself, be satisfactory proof of the marriage if the testimony of Lulu were not in the case at all.

It is argued with much force, however, that a marriage presupposes a contract, and that evidence of cohabitation and reputation cannot be resorted to where one or both of the parties testify to the

terms of the contract itself. This rule might well be invoked if it involved no rights except those of the party testifying, and such party so testified that it appeared that no marriage in fact had been consummated. In the case at bar, however, we have an infant who is entitled to prove his right to the succession by any and all evidence that tends to establish his mother's legitimacy. He is not bound by his grandmother's inability to reproduce after 40 years the identical language that she claims was employed in consummating the informal marriage. In the instant case this class of testimony is available as well for the woman who claims to be the widow. Foregoing for the moment any close analysis of the agreement to which she testifies, it is clear enough that she does not testify that their arrangement was not a marriage and the ensuing cohabitation a meretricious one. The most that can be said in that respect is that she testified to an agreement of doubtful import. This being so, she was entitled to show the practical construction given by the parties to that arrangement, and that construction, the record shows, was consistent only with the existence of the marital relationship. Some cloud is cast upon this chain of testimony by those from whom it might be least expected. The brother of Lulu, on cross-examination, indicates that the parties could not have been married until 1893, because he says it was two years after he became acquainted with Hulings, and that such acquaintance began in 1891. He is an illiterate man, however, unable to write his name, and evidently did not know anything about dates, including the date of his acquaintance

with Hulings, for Hulings' letters addressing Lulu as "my dear wife" are in the record back as far as 1887, and the rest of the brother's testimony shows that he knew of the alleged marriage about the time claimed for it. So a court is warranted in saying that the dates 1891 and 1893 in this witness's testimony are manifestly wrong, and that he did in fact know Hulings some 7 years earlier. Again, the mother of Lulu testifies that her daughter and Hulings told her that they had been married at Pittsburg by an alderman, and had a certificate of the marriage. This, however, if correct, only tends to show that they were ashamed of the unconventional methods adopted by them, and is not necessarily inconsistent with their informal marriage in fact.

We come now to consider the terms of the alleged marriage contract to which Lulu testifies. The first part of the proposal made by Hulings indicated his desire that the two live as man and wife. This would seem to be a proposal to establish only a system of concubinage. Other terms indicate he was proposing a marriage *in futuro.* At some time in the discussion she expressly refused, and at some time she expressly assented to his proposal, but her testimony is not very clear as to what she agreed to or disagreed to. Eventually, however, she gets to this:

"He said that, and he took my hand, and he said, 'Now we are man and wife,' and he kissed me, and after that we went in to my mother—of course, he had talked about marriage so much— and he told my mother we had gotten married, and she said she wasn't surprised, and he put his hand

on my shoulder, and my mother shook hands with us and kissed us both.''

The language thus imputed to Hulings, ''Now we are man and wife,'' is ambiguous. It is not clear whether he means to express his opinion of the legal effect of the proposals made by him on the back porch, or to then and there declare the existence of a marriage relation between the parties. The latter construction is the one that is most nearly in accord with decency. It is to be borne in mind that there is no evidence of any illicit relations between these parties, thus distinguishing the situation from the case styled *Stevenson's Estate,* 272 Pa., 291, 116 A., 162, and many authorities on that line, and that there was nothing secretive about their relations, thus distinguishing it from the *Craig case,* 273 Pa. St., 530, 117 A., 221. It is consequently sound public policy to view the language quoted as describing the then purpose of Hulings to take Lulu for his wedded wife. It would be a grave injustice after these parties had held themselves out as husband and wife, and raised a daughter, held out as legitimate, to permit either of them to take advantage of equivocal language after that daughter on the strength of her legitimacy had herself married a young man who would have recoiled from that sort of an alliance, if his prospective bride had been illegitimate. We conclude, therefore, that, when Hulings said, ''Now we are man and wife,'' he was declaring his marriage in *verba de presenti.*

The plaintiff in error contends, however, that the record does not show that Lulu by like language assented to the marriage. The record on this point

is not clear.  She says that she at first objected, and finally consented.  The fairest inference is that what she objected to was dispensing with any marriage, and that what she consented to was the informal marriage consummated on Hulings' part by the language just referred to.  But the efficacy of the ceremony did not depend on both of the parties giving their consent in express terms.  The *verba de presenti* did not need to be actually uttered by both.  The expression of them by the one and the consent thereto by the other were sufficient.  The general rule is thus stated in 18 Ruling Case Law, 427:

"However, unqualified words of present consent need not be used by both parties.  If, for instance, the words of the woman do not show unqualified consent to the man's suggestions of marriage, the circumstances may show that whatever words she did use were employed by her in the sense of present marriage.  Indeed, the woman may assent by acts unaccompanied by words.  This is indicated by the cases in which the man suggests marriage in present terms, and there follows an immediate assumption of the marriage relation under circumstances implying that she is consenting to present marriage, and not merely to sexual intercourse."

Such is not only the general rule, but it is the rule particularly followed in Pennsylvania.  The Supreme Court of that state, in *Matter of Estate of Comly, Dec'd.*, 185 Pa., 208, 39 A., 890, was considering a case where it could not have been claimed that any words *de presenti* were employed by the woman in response to words of that kind

used by the man. She did, however, respond in words indicating, if anything, her consent to a ceremony *in futuro,* and then acquiesced by tacitly accepting him, and thus entered on the contemplated relation. The court said:

"Can it be possible that any words which she might have spoken could have made out a present contract on her part more absolutely than did this act of acceptance? * * * Was it necessary to say in words what this act said more loudly than words? In a hundred cases which might be cited, it has been decided that silence means acquiescence. In this case there was something more potent than silence—the deliberate action of the claimant."

It is, therefore, concluded that the language testi-fied to by Lulu was sufficient to consummate a marriage by *verba de presenti,* although, as we find, *verba de futuro* might support such a marriage under the Pennsylvania law when followed by cohabitation, and when not preceded by an illicit relationship. *Richard* v. *Brehm, supra; Comly's case, supra.*

From the written opinion of the trial court it is evident that that court with the principal witness before it in person believed the story narrated by Lulu. We cannot say that the court was manifestly wrong in so doing, although we are constrained to the view that such rites as that testified to are seldom in fact performed. We are satisfied, however, that this woman is no mere adventuress, seeking the compensation of a mistress from the estate of a dead paramour. Though Hulings was evidently untrue to the obligations incurred by this informal marriage, and though

at some time he may have denied its existence, the conduct of Lulu was such as to attract the confidence and affection of all the Hulings family of whom we have knowledge. To them, as well as to the public, she was not Harry's mistress, but Harry's loyal wife. If Harry Hulings were alive, no court recognizing a common-law marriage at all would permit him to destroy the effect of his long holding himself out as this woman's husband by showing a subsequent adulterous career with another woman. It would not hear him denounce the mother of Harry Hulings Schaffer as illegitimate after he had induced the boy's father to contract a marriage on the strength of her legitimacy. It would not allow him to repudiate his sworn testimony that Lulu was his wife, accompanied as it was with a course of conduct reconcilable with that theory.

That the marriage of the parties was not promptly asserted after Hulings' death is, of course, a circumstance to be considered, as well as the fact that she concealed the precise nature of her marriage before Hulings' death. It is not, however, to her discredit that she was somewhat ashamed of the unconventional nature of her marriage. Hulings' abandonment of her doubtless caused her to see the folly of thus flouting the ceremonies that society has prescribed for formal marriages. It is likely true, too, that she did not know whether she could establish her case if she did press it. Anyhow, there is nothing in her failure to sooner assert her claim of wifehood that cannot be harmonized with the facts as found by the trial court.

We accordingly find no reason to disturb the

judgment of the trial court, except the lack of a pleading on the part of the Pennsylvania Trust Company, as guardian, to support a judgment in its favor. When such pleading is filed, the judgment is affirmed.

*Judgment affirmed.*

SAYRE and MIDDLETON, JJ., concur.